620 A.2d 327

Sonja FAYA

v.

Betty ALMARAZ, Personal Representative of
the Estate of Rudolph Almaraz et al.

Perry Mahoney ROSSI et vir.

v.

Betty ALMARAZ, Personal Representative of
the Estate of Rudolph Almaraz et al.

Nos. 143, 144, Sept. Term, 1991.

Court of Appeals of Maryland.

March 9, 1993.

436

Harry B. Siegel (Joel Marc Abramson, Law Offices of Joel Marc Abramson, all on brief), Columbia, for appellant.

Deborah Byrnes (William B. Whiteford, Whiteford, Taylor, & Preston, all on brief), Towson, Paul F. Strain (Jana Howard Carey, David J. Heubeck, Mitchell Y. Mirviss, Venable, Baetjer & Howard, all on brief), Baltimore, for appellees.

Jonathan Schochor (Philip C. Federico, Kerry D. Staton, Schochor, Federico and Staton, PA, all on brief), Baltimore, for appellant in No. 144.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

MURPHY, Chief Judge.

These companion cases present the important question whether a surgeon infected with the AIDS virus has a legal duty to inform patients of that condition before operating upon them and, failing that, whether a patient's fear of having contracted the AIDS virus from the infected surgeon constitutes a legally compensable injury where the patient has not shown HIV–positive status.

I

Central to an understanding of these cases are the nature of the acquired immune deficiency syndrome (AIDS) and its

relationship to the human immunodeficiency virus (HIV or "the AIDS virus"). First isolated and identified by scientists in 1983, HIV is a retrovirus that attacks the human immune system. The virus invades host cells, notably certain lymphocytes, replicates itself, weakens the immune system, and ultimately destroys the body's capacity to ward off disease.

HIV's presence is detected by a laboratory blood test for antibodies to the virus. The virus may reside latently in the body for periods as long as ten years or more, during which time the infected person will manifest no symptoms of illness and function normally. HIV typically spreads via genital fluids or blood transmitted from one person to another through sexual contact, the sharing of needles in intravenous drug use, blood transfusions, infiltration into wounds, or from mother to child during pregnancy or birth. *See* Jonathan N. Weber & Robin A. Weiss, *HIV Infection: The Cellular Picture,* Scientific American, October 1988, at 100–109; William A. Haseltine & Flossie Wong-Staal, *The Molecular Biology of the AIDS Virus,* Scientific American, October 1988, at 52–62; Jay A. Levy, *Human Immunodeficiency Viruses and the Pathogenesis of AIDS,* 261 J.Am. Med.Ass'n 2997, 2998–3001 (1989); Thomas R. O'Brien et al., *Testing for Antibodies to Human Immunodeficiency Virus Type 2 in the United States,* Morbidity and Mortality Weekly Report, July 17, 1992, Vol. 41, No. RR–12; Donald Hermann & William Schurgin et al., *Legal Aspects of AIDS* §§ 1:05–1:07, 1:24–1:34 (1991).

AIDS, in turn, is the condition that eventually results from an immune system gravely impaired by HIV. Medical studies have indicated that most people who carry the virus will progress to AIDS. AIDS patients by definition are profoundly immunocompromised; that is, they are prone to any number of diseases and opportunistic infections that a person with a healthy immune system might otherwise resist. AIDS is thus the acute clinical phase of immune dysfunction. Among the prevalent "AIDS–defining" diagnoses are Kaposi's sarcoma, a rare cancer; *pneumocystis*

*carinii* pneumonia; cytomegalovirus infections of the eye and gastrointestinal tract; mycobacterium avium-intracellulare, a rare type of tuberculosis; and severe, prolonged yeast infections or herpes. *See* Institute of Medicine/National Academy of Science, *Confronting AIDS: Directions for Public Health, Health Care and Research* (1986) and *Confronting AIDS: Update 1988* (1988); Robert R. Redfield & Donald S. Burke, *HIV Infection: The Clinical Picture,* Scientific American, October 1988, at 90–98; Donald Hermann & William Schurgin et al., *Legal Aspects of AIDS* §§ 1:10–1:23 (1991). AIDS is invariably fatal.

## II

Dr. Rudolf Almaraz, an oncological surgeon specializing in breast cancer with operative privileges at the Johns Hopkins Hospital (Hopkins) in Baltimore, knew himself to be HIV–positive, *i.e.* a carrier of the HIV virus, since 1986. On October 7, 1988, Almaraz performed a partial mastectomy and axillary dissection on Sonja Faya at Hopkins. He removed an axillary hematoma from Faya the following March. On November 14, 1989, again at Hopkins, Almaraz surgically excised a benign lump from the breast of Perry Mahoney Rossi. The therapeutic outcome of these operations is not in dispute.

On October 27, 1989, Almaraz was first diagnosed as suffering from cytomegalovirus retinitis, the eye infection signaling full-blown AIDS. That diagnosis was confirmed by a second ophthalmologist on November 17, 1989. Thus, as well as knowing his HIV–positive status throughout the period in question, Almaraz knew that he had AIDS prior to the Rossi operation.

Almaraz gave up his practice of medicine on March 1, 1990. He terminated his association with Hopkins in June of that year. He died of AIDS on November 16, 1990. Faya and Rossi learned of their physician's illness for the first time from a local newspaper on or about December 6, 1990, well over a year after Rossi's operation and twenty

months after Faya's last contact with Almaraz. Both Faya and Rossi immediately underwent blood tests for the AIDS virus, which came back negative for both. Nevertheless, by December 11 Sonja Faya, Perry Mahoney Rossi, and her husband, Dennis T. Rossi (appellants), filed suit against Almaraz's estate, his Maryland professional association business entity, and Hopkins (appellees) for compensatory and punitive damages.

### III

In their separate actions filed in the Circuit Court for Baltimore City, the appellants, in a multiplicity of counts, alleged various wrongful acts by Dr. Almaraz and Hopkins.[1] Common to both complaints were counts alleging negligence, negligent failure to obtain the patients' informed consent, fraud, and intentional infliction of emotional distress. To these Faya added counts for negligent misrepresentation and breach of contract. The Rossi complaint, as amended, contained further counts alleging loss of consortium, breach of fiduciary duty, and battery.

The gist of the complaints was that Almaraz acted wrongfully in operating on the two women without first telling them that he was HIV–positive (and, later, ill from AIDS proper), and that Hopkins was culpable for permitting him to do so. More specifically, appellants alleged that at the time of the consultations and surgeries, Almaraz, knowing of his illness, failed to inform them of any risk of contracting HIV that might result from his performance of the surgical procedures. They alluded to the possibility of a puncture or laceration through the protective garments worn by the surgeon and a consequent commingling of his blood with their blood. They claimed that by undergoing their operations in ignorance of Almaraz's illness, they were

---

1. Faya and Rossi filed parallel complaints with the Health Claims Arbitration Office of Maryland. Both parties, however, subsequently elected to waive arbitration pursuant to Maryland Code (1989 Repl. Vol.) § 3–2A–06 of the Courts & Judicial Proceedings Article.

exposed to a hazard they would otherwise have avoided by withholding their consent, namely, a risk of AIDS attendant upon invasive surgery.

Both Faya and Rossi alleged that the hospital failed independently to take steps, such as the suspension of Dr. Almaraz's surgical privileges, to prevent him from operating on unsuspecting patients, or to adequately obtain informed consent from such patients. They further imputed to Hopkins vicarious liability for Almaraz's conduct, alleging that the physician acted as the hospital's agent or employee.

Appellants averred in their complaints that as a proximate result of the operations and their subsequent discovery of the alleged wrongdoing by Almaraz and Hopkins, they incurred injuries in the form of exposure to HIV and risk of AIDS, physical injury and financial cost resulting from surveillance blood testing for HIV antibodies, pain, fear, anxiety, grief, nervous shock, severe emotional distress, headache and sleeplessness.

Appellees filed motions to dismiss the complaints pursuant to Maryland Rule 2–322 on the ground that appellants had failed to state a claim upon which relief could be granted. The representatives of Dr. Almaraz asserted that the physician owed no duty to disclose his ailment as part of the doctor-patient exchange leading to informed consent. Hopkins contended, in the main, that it had no duty to investigate and ascertain Almaraz's HIV status; the hospital added that the obligations imposed by the informed consent doctrine did not extend to it in any case. The appellees further averred that the complaints were legally deficient in that appellants failed to allege that the AIDS virus entered their bodies as a result of surgery, and that the claimed injuries were not legally compensable because they rested on fear of a risk that never materialized.

The court (Kaplan, J.) dismissed both complaints in their entirety. In so doing, it concluded that Faya and the Rossis had failed to allege a legally compensable injury, and that

their counts must therefore fail as a matter of law. The court first held that appellants had failed to plead sufficient allegations of exposure to the AIDS virus. Judge Kaplan reasoned:

"Because there are no reported cases of transmission of AIDS from a surgeon to a patient, such transmission is only a theoretical possibility when proper barrier techniques are employed....

Plaintiff[s] [have] not alleged that Dr. Almaraz failed to use proper barrier techniques. Furthermore, Plaintiff[s] [have] not alleged that any incident or accident occurred during surgery that would have caused Dr. Almaraz's blood to enter [their bodies]."

The trial court next observed that Ms. Faya and Mrs. Rossi had tested HIV–negative, that is, free of the AIDS virus, in early December 1990. Judge Kaplan thus concluded that even if the appellants had been potentially exposed to the virus, their HIV–negative status more than six months after surgery made it extremely unlikely that they will develop AIDS. Accordingly, the court deemed the injury claimed by appellants to be "the fear that something that did not happen could have happened," holding that such a fear did not represent an actionable injury for which damages might be recovered. Faya and the Rossis appealed to the Court of Special Appeals. We issued a writ of certiorari prior to intermediate appellate review to address the important and timely issues raised in these cases.

IV

A

In determining whether the trial court erred in granting the motions to dismiss, we must accept as true all well-pleaded facts and allegations in the complaints, together with reasonable inferences properly drawn therefrom. Dismissal is proper only if the facts and allegations, so viewed, would nevertheless fail to afford plaintiff relief if proven. *Berman v. Karvounis*, 308 Md. 259, 264–65, 518

A.2d 726 (1987); *Sharrow v. State Farm Mutual,* 306 Md. 754, 768, 511 A.2d 492 (1986); *Flaherty v. Weinberg,* 303 Md. 116, 135–36, 492 A.2d 618 (1985); *Ungar v. State,* 63 Md.App. 472, 479, 492 A.2d 1336 (1985).

We said in *Figueiredo–Torres v. Nickel,* 321 Md. 642, 647, 584 A.2d 69 (1991), that " 'any ambiguity or uncertainty in the allegations bearing on whether the complaint states a cause of action must be construed against the pleader,' " quoting *Sharrow, supra,* 306 Md. at 768, 511 A.2d 492. *See also Berman, supra,* 308 Md. at 265, 518 A.2d 726 ("[W]hat we consider are allegations of fact and inferences deducible therefrom, not merely conclusory charges.")

■ Moreover, in order to place a complaint in context, we may take judicial notice of additional facts that are either matters of common knowledge or capable of certain verification. McCormick, *Evidence,* §§ 329–330 (4th ed. 1992); Murphy, *Maryland Evidence Handbook,* § 1000(A)(1–2) (1989). Included in the latter category are facts "capable of immediate and certain verification by resort to sources whose accuracy is beyond dispute." Murphy, *supra,* § 1000(A)(2); *see also* McLain, *Maryland Evidence,* § 201.4 (1987); Fed.R.Evid. 201(b)(2). In the medical context we have relied, for example, on basic information about sexually transmitted diseases as found in medical journals and reports of the Centers for Disease Control. *See B.N. v. K.K.,* 312 Md. 135, 139–40, 538 A.2d 1175 (1988) (genital herpes is a contagious, painful, and incurable disease, spread by sexual contact, that endangers public health). The Maryland Court of Special Appeals has relied on similar sources to assess the need for precautions against AIDS transmission. *See Wiggins v. State,* 76 Md. App. 188, 198, 544 A.2d 8 (1988) (wearing of gloves by courtroom security personnel during trial of defendant possibly suffering from AIDS is wholly inconsistent with current theories concerning AIDS transmission), *rev'd on other grounds,* 315 Md. 232, 554 A.2d 356 (1989).

■ Before examining the legal sufficiency of the appellants' complaints, therefore, we focus on several well-established and scientifically understood facts about AIDS and its transmission.[2] As we have already noted, AIDS is the disease that results when opportunistic infection preys on a bodily immune system that has been weakened by HIV. HIV is a necessary prerequisite to developing AIDS. U.S. Department of Health and Human Services, *Surgeon General's Report on Acquired Immune Deficiency Syndrome* 10 (1987); Hermann & Schurgin, *supra*, §§ 1:05–1:06. HIV is a fragile virus that can survive only in the habitat of bodily fluids. While others can carry HIV, the only fluids that can transmit the virus are blood, semen, vaginal fluids and breast milk. For the virus to pass from one person to another, at least one such fluid of the carrier must enter the body of the other. *Surgeon General's Report*, at 16. Hermann & Schurgin, *supra*, § 1:07. HIV is primarily transmitted through unprotected sexual intercourse, the sharing of contaminated syringes among intravenous drug users, the blood transfusions, although transmission by the latter route has greatly decreased since the Red Cross began testing the blood supply in 1985. *Surgeon General's Report*, at 17–20; Hermann & Schurgin, *supra*, §§ 1:24–1:27.

The virus is only transmitted if it reaches the bloodstream of the transmittee. That is, the fluid of the carrier must pass through some channel to the transferee's blood system. Hence unprotected sex, needle-sharing, pregnancy and nursing are relatively efficient modes of transfer, while others are not; for HIV to pass in non-sexual, non-needle-sharing contexts, blood must pass both through a wound in the carrier and into a wound in the transferee. In short, the two parties' blood must commingle. Thus there have been no reports of HIV transmission through casual con-

---

**2.** The trial court took notice of most of these facts, an action which we affirm. *See Smith v. Hearst Corp.*, 48 Md.App. 135, 141, 426 A.2d 1, 4 (1981), *cert. denied*, 290 Md. 721 (1981).

tact. *Surgeon General's Report,* at 21; Hermann & Schurgin, *supra,* § 1:24.[3]

We take notice of one other fact regarding HIV. While there is often a long latency period between infection with HIV and the onset of AIDS, at least 95% of HIV carriers will test positive for *the virus* (though not manifest AIDS) within six months of acquiring it. Morbidity and Mortality Weekly Report, July 21, 1989, Vol. 38, No. S–7. *See also* C. Robert Horsburgh et al., *Duration of Human Immunodeficiency Virus Infection before Detection of Antibody,* The Lancet, September 16, 1989, at 637–40.[4]

These characteristics of HIV and AIDS, which the lower court also recognized, are proper objects of judicial notice.[5]

---

**3.** We note that four separate studies conducted between 1985 and 1989, which examined a total of 4,703 patients who had been operated on by surgeons with AIDS, found no documented cases of HIV transfer from surgeon to patient. *See* Jeffrey J. Sacks, *AIDS in a Surgeon,* 313 New England Journal of Medicine 1017–1018 (1985) (study of 400 patients of Florida surgeon with AIDS); LTC Frances P. Armstrong et al., *Investigation of a Health Care Worker with Symptomatic Immunodeficiency Virus Infection: An Epidemiologic Approach,* 152 Military Medicine 414–418 (1987) (study of 1804 patients of military surgeon with AIDS); John D. Porter et al., *Management of Patients Treated by Surgeon with HIV Infection,* The Lancet, January 13, 1990, at 113–14 (study of 339 patients of British surgeon with AIDS); Ban Mishu et al., *A Surgeon With AIDS: Lack of Evidence of Transmission to Patients,* 264 J.Am.Med.Ass'n 467–70 (1990) (study of 2160 patients of Nashville surgeon with AIDS). Another study found the risk of HIV transfer from infected patients to health care workers, even when the latter were percutaneously exposed to the blood of the former, to be a mere 0.3% per exposure. David K. Henderson et al., *Risk for Occupational Transmission of Human Immunodeficiency Virus Type 1 (HIV-1) Associated with Clinical Exposures,* 113 Annals of Internal Medicine 740, 743–44 (1990).

**4.** There has been some concern about the accuracy of the blood tests. However, when the separate ELISA (Enzyme–Linked Immunosorbent Assay) and Western Blot tests are used in conjunction, they are more than 99.9% accurate. U.S. Department of Health and Human Services, *Voluntary HIV Counseling and Testing: Facts, Issues, and Answers,* 1991. *See also Kozup v. Georgetown University,* 663 F.Supp. 1048, 1052–53 (D.D.C.1987).

**5.** Other courts have taken judicial notice of these facts. *See Doe v. Borough of Barrington,* 729 F.Supp. 376, 381 (D.N.J.1990) (observing

We, therefore, reject the appellants' threshold contention that the court below, in dismissing their complaints, erroneously adopted statistics and medical information that were properly the subject of expert testimony, open to challenge at trial. *See School Bd. of Nassau County v. Arline,* 480 U.S. 273, 288, 107 S.Ct. 1123, 1131, 94 L.Ed.2d 307 (1987) ("[C]ourts normally should defer to the reasonable medical judgments of public health officials."); *Doe v. Borough of Barrington,* 729 F.Supp. 376, 381 (D.N.J.1990) ("This court must take medical science as it finds it; its decision may not be based on speculation of what the state of medical science may be in the future."). These facts derive from reputable scientific journals and institutions and are well-accepted within the medical community.

### B

■ While the appellants allege many counts of misconduct by the appellees, the core of their complaints is that Dr. Almaraz was negligent in failing to disclose his HIV–positive status before operating on Faya and Rossi. Appellants assert that a physician's duty of care must encompass disclosure that an operating surgeon's HIV–positive status poses the risk, however minimal, of transmission of the AIDS virus during surgery. Appellants maintain that, having properly pleaded this issue, the trial court erred in not

---

that AIDS cannot be spread through casual contact, rejecting defendants' proffer of one article theorizing to the contrary in light of the uncertain state of medical knowledge about AIDS); *Burk v. Sage Products, Inc.,* 747 F.Supp. 285, 288 (E.D.Pa.1990) ("It is a medically accepted fact ... that a person who has been infected will *still test positive* for the HIV antibody during th[e] latency period when no symptoms [of AIDS] are evident, assuming the accuracy of the HIV test. It is extremely unlikely that a patient who tests HIV-negative more than six months after a potential exposure will contract the disease as a result of that exposure."); *Kozup v. Georgetown University,* 663 F.Supp. 1048 (D.D.C.1987) (observing the history of the medical understanding of AIDS and the combined 100% effectiveness of the two HIV antibody tests); *Chalk v. U.S. Dist. Court Cent. Dist. of California,* 840 F.2d 701 (9th Cir.1988) (observing Surgeon General's report that HIV cannot be spread through casual contact).

**448**

allowing a jury to evaluate Almaraz's conduct and its consequences. We agree.

■ To state a cause of action in negligence, a plaintiff must allege that the defendant had a duty of care which he breached, and that the breach proximately caused legally cognizable injury. *Pennwalt Corp. v. Nasios,* 314 Md. 433, 453, 550 A.2d 1155 (1988); *Jacques v. First National Bank of Maryland,* 307 Md. 527, 531, 515 A.2d 756 (1986); *Cramer v. Housing Opportunities Comm'n,* 304 Md. 705, 501 A.2d 35 (1985).

The concept of legal duty, we observed years ago, emanates from "the responsibility each of us bears to exercise due care to avoid unreasonable risks of harm to others." *Moran v. Faberge,* 273 Md. 538, 543, 332 A.2d 11 (1975). We have explored the question of duty in the very context of infectious disease which the instant case represents. In *B.N. v. K.K., supra,* a nurse alleged that a doctor with whom she had been intimate was negligent in failing to inform her of his genital herpes. We began with the premise that "an important factor used to determine the existence of a duty is foreseeability." 312 Md. at 141, 538 A.2d 1175. We then observed that "one who knows he or she has a highly infectious disease can readily foresee the danger that the disease may be communicated to others with whom the infected person comes into contact." *Id.* at 142, 538 A.2d 1175. Because of this foreseeability of transmission, we held that the doctor had a legal duty either to refrain from sexual contact with others or to inform his sexual partners of his disease. *Id.* at 143, 538 A.2d 1175.

■ The same principle applies in the instant case. Under the allegations of the appellants' complaints, taken as true, it was foreseeable that Dr. Almaraz might transmit the AIDS virus to his patients during invasive surgery. Thus, we are unable to say, as a matter of law, that Dr. Almaraz owed no duty to the appellants, either to refrain from performing the surgery or to warn them of his condition. This is so even though the medical literature indicates

that, with proper barrier techniques, the risk of HIV transmission during surgery is extremely low, for legal scholars have long agreed that the *seriousness* of potential harm, as well as its probability, contributes to a duty to prevent it. *Restatement, Second, Torts*, § 293(c), comment c; Prosser and Keeton, *Torts*, § 31 (5th ed. 1984); *Moran, supra*, 273 Md. at 543, 332 A.2d 11 ("Whether unreasonable risk exists in a given situation depends on balancing the probability and seriousness of harm, if care is not exercised, against the costs of taking appropriate cautions."). While it may be unlikely that an infected doctor will transmit the AIDS virus to a patient during surgery, the patient will almost surely die if the virus is transmitted.

The House of Delegates of the American Medical Association (AMA) has adopted the following policy statement on HIV–infected physicians:

> "It should be noted that transmission of HIV from an infected physician to a patient has not yet been reported, but it is a theoretical possibility during invasive procedures. It is longstanding AMA policy that when the scientific basis for patient protection policy decisions are unclear, the physician must err on the side of protecting patients.
>
> "That being the case, the following recommendations should be followed in the management of an HIV–infected health care worker:
>
> "HIV–infected physicians should disclose their HIV seropositivity to a public health officer or a local review committee, and should refrain from doing procedures that pose a significant risk of HIV transmission or perform these procedures only with the consent of the patient and the permission of a local review committee. This committee will determine the activities the physician can continue to perform."

AMA "Digest of HIV/AIDS Policy," September 14, 1992. Similarly, the AMA's Code of Medical Ethics provides:

> "A physician who knows that he or she has an infectious disease, which if contracted by the patient would pose a

significant risk to the patient, should not engage in any activity that creates a risk of transmission of that disease to the patient. The precautions taken to prevent the transmission of a contagious disease to a patient should be appropriate to the seriousness of the disease and must be particularly stringent in the case of a disease that is potentially fatal.

"A physician who knows that he or she is [HIV] seropositive should not engage in any activity that creates a risk of transmission of the disease to others. A physician who has HIV disease or who is seropositive should consult colleagues as to which activities the physician can pursue without creating a risk to patients."

AMA Council on Ethical and Judicial Affairs, "Current Opinions, Code of Medical Ethics," 1992.

■ Thus, in evaluating the well-pleaded allegations of the complaints with respect to the duty component of the tort of negligence, we cannot conclude that they are legally insufficient to survive the appellees' motions to dismiss; in other words, we cannot say as a matter of law that no duty was imposed upon Dr. Almaraz to warn the appellants of his infected condition or refrain from operating upon them.[6]

---

6. We noted in *Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014 (1977), that a surgeon has a legal duty, except in emergency circumstances, to obtain the "informed consent" of the patient before undertaking the surgical procedure. We said that the surgeon's duty is "to explain the procedure to the patient and to warn him of any material risks or dangers inherent in or collateral to the therapy, so as to enable the patient to make an intelligent and informed choice about whether or not to undergo such treatment." *Id.* at 439, 379 A.2d 1014. We further said that the proper test for measuring a physician's duty to disclose risk information is whether such data would be material to the patient's decision. *Id.* at 443, 379 A.2d 1014. In this regard, we explained that "[a] material risk is one which a physician knows or ought to know would be significant to a reasonable person in the patient's position in deciding whether or not to submit to a particular medical treatment or procedure." *Id.* at 444, 379 A.2d 1014.

The cause of action for lack of informed consent is one in tort for negligence, as opposed to battery or assault. *Id.* at 440 n. 4, 379 A.2d 1014.

The appellants pleaded that as a result of Dr. Almaraz's breach of duty, they were put in fear of having contracted HIV and thereby suffered the derivative consequences of that fear, which were manifested by emotional and mental distress, headaches, sleeplessness, and, in addition, the pain and expense associated with repeated blood tests. We turn now to the question of whether these are legally compensable injuries where the appellants have not alleged in their complaints an actual transmission of the HIV virus into their bodies during the surgical procedures. Instead, appellants allege only that because of Dr. Almaraz's HIV positive status, he exposed them to the virus during the surgery. In this regard, the complaints do not allege that subsequent blood tests have revealed that the appellants have, in fact, shown HIV positive status.

## C

Courts have differed on the question of recovery of damages for the fear of AIDS and attendant physical consequences absent an HIV–positive test. In *Burk v. Sage Products, Inc.*, 747 F.Supp. 285 (E.D.Pa.1990), the court rejected a paramedic's claim based on fear of contracting AIDS after he suffered a needle-stick from a discarded syringe. The paramedic could not demonstrate that the needle had been used on an AIDS patient, and he himself had tested HIV–negative no fewer than five times during the thirteen months after the incident. *Id.* at 286–287. The court held first that, in the absence of any allegation that the syringe harbored HIV, the plaintiff had failed to establish an exposure to the AIDS virus sufficient to support a cause of action. *Id.* at 287. Moreover, the court found no compensable injury: "Plaintiff here has alleged no injury which arises out of his exposure to the AIDS virus. Rather, plaintiff's only injuries stem from his *fear* that he has been exposed to the disease." *Id.* at 288. The court deemed such fear to be unfounded, observing that the five negative tests indicated to a high degree of

medical certainty that the paramedic would not develop AIDS from his needle-stick. *Id.* [7]

Other courts have concurred with *Burk* in denying recovery where the plaintiff can demonstrate neither a channel of exposure to the AIDS virus nor demonstrable injury in the form of an HIV–positive test. *See Funeral Services by Gregory, Inc., v. Bluefield Community Hospital*, 186 W.Va. 424, 413 S.E.2d 79 (1991) (no recovery for a mortician who had embalmed an AIDS–infected corpse, where he had worn proper protective gear and had not alleged any avenue of exposure); *Hare v. State*, 173 A.D.2d 523, 570 N.Y.S.2d 125 (2 Dept.1991) (recovery denied for hospital employee bitten by unrestrained inmate, where employee failed to prove that inmate was infected and where plaintiff had tested HIV–negative); *Doe v. Doe*, 136 Misc.2d 1015, 519 N.Y.S.2d 595 (Sup.1987) (recovery denied for "AIDS–phobia" based on husband's alleged homosexual affair, wife having failed to allege that husband was infected with the disease and having failed to allege that she had contracted HIV).[8]

---

**7.** Most cases addressing the viability of claims alleging fear of contracting disease concern exposure to asbestos, toxic chemicals, pesticides, and drug products. These cases often rely on the first holding in *Burk:* in the absence of facts demonstrating legitimate exposure to the disease-causing agent, there can be no recovery. *See, e.g., Harper v. Illinois Cent. Gulf R.R.*, 808 F.2d 1139, 1140 (5th Cir.1987) (absent competent evidence of exposure to potentially harmful chemicals, plaintiffs cannot recover for mental anguish arising from fear of future health complications); *Maddy v. Vulcan Materials Co.*, 737 F.Supp. 1528, 1533 (D.Kansas 1990) (in cases claiming personal injury from toxic substances, it is essential that plaintiff demonstrate exposure to harmful levels of such substances); *Anderson v. W.R. Grace & Co.*, 628 F.Supp. 1219, 1226 (D.Mass.1986) (fear of contracting cancer after drinking contaminated water held compensable injury).

**8.** Still other jurisdictions require proof of actual injury, i.e. an HIV-positive test, even where the plaintiff has clearly shown exposure to the AIDS virus. *See Transamerica Insurance Co. v. Doe*, 111 Ariz.App. 51, 840 P.2d 288 (1992) (no recovery under an insurance policy covering "bodily injury" for plaintiffs who had been clearly exposed to HIV but could show no competent evidence of any physical injury resulting from that exposure); *Poole v. Alpha Therapeutic Corp.*, 698 F.Supp. 1367 (N.D.Ill.1988) (wife of allegedly negligently infected

On the other hand, some courts have reasoned differently. In *Johnson v. W. Va. University Hospitals,* 186 W.Va. 648, 413 S.E.2d 889 (1991), the court affirmed a judgment for a police officer attacked in a hospital by an AIDS–infected patient who had first bitten himself on the arm, thereby drawing his own infected blood into his mouth, and then bitten the officer. There, the officer sued the hospital, claiming that it negligently failed to advise him that the patient had AIDS, and that as a result of his exposure to AIDS, the officer had suffered from emotional distress. Although regularly tested for the HIV virus after having been bitten by the patient, the tests were negative for the disease. The officer's treating psychologist testified that the officer suffered from post traumatic stress disorder and was unable to sleep. The court noted that, absent physical injury, there would be no recovery for emotional distress. It held, however, that there was evidence of physical injury because of the officer's having been bitten and that his physical injury included sleeplessness, loss of appetite, and other physical manifestations accompanying the emotional distress. The officer's physical injury, the court said, was a factor going to the reasonableness of the officer's fear of contracting AIDS for which he could recover damages for emotional distress, even though he tested HIV–negative. The court emphasized that its decision did not permit recovery of emotional distress damages by anyone who merely comes into contact with an AIDS–infected individual; rath-

---

plaintiff denied recovery for negligent infliction of emotional distress where she, though clearly exposed to HIV, had failed to allege any physical injury or illness.)

For cases outside the AIDS context, *see e.g. Bubash v. Philadelphia Elec. Co.,* 717 F.Supp. 297, 300 (M.D.Pa.1989) (mere exposure to radiation not the equivalent of physical injury); *In re Hawaii Federal Asbestos Cases,* 734 F.Supp. 1563, 1569–70 (D.Ha.1990) (generalized fear of cancer, absent knowledge of functional impairment, insufficient to constitute a compensable harm underlying emotional distress); *De Stories v. City of Phoenix,* 154 Ariz. 604, 744 P.2d 705, 709–10 (App.1987) (no recovery for "cancer-phobia" following asbestos exposure absent physical injury, unless physical harm developed as a result of emotional distress).

er, it said that "recovery of such damages is limited to the situation where the plaintiff is actually exposed to the AIDS virus as a result of a physical injury, and emotional distress, along with physical manifestations of such distress, result therefrom." *Id.*, 413 S.E.2d at 894.

In *Carroll v. Sisters of St. Francis Health Services, Inc.*, 1992 WL 276717 (Tenn.App.1992), certiorari petition filed December 11, 1992, the plaintiff had been pricked by a needle while visiting her sister in the hospital. Even though the plaintiff was unable to show actual exposure to the HIV virus, or that she tested HIV–positive, she sued the hospital for damages which she alleged resulted from fear that she had contracted the disease. In reversing a summary judgment against the plaintiff, the court relied upon *Laxton v. Orkin Exterminating Co.*, 639 S.W.2d 431 (Tenn. 1982), in which the Tennessee Supreme Court allowed plaintiffs to recover for fear of harm against an exterminating company which had leaked dangerous chemicals into their drinking supply, even though plaintiffs showed no physical symptoms of illness. *Laxton* specified, however, that "The period of mental anguish ... would be confined to the time between discovery of the ingestion and the negative medical diagnosis or other information that puts to rest the fear of injury." 639 S.W.2d at 434.

Explicitly rejecting "the strict rules of actual exposure" required by *Burk* and its progeny, the *Carroll* court read *Laxton* to allow recovery for fear of AIDS even though the plaintiff could show neither actual HIV exposure nor an HIV–positive test. It said:

"We construe *Laxton* to set a standard of 'reasonableness' of the fear.... The gravamen of the action in *Laxton* was the effect of defendant's negligence on the plaintiffs' state of mind and the Court found under the peculiar facts of that case that they could reasonably have the fear of acquiring serious medical maladies. The court was quite clear, however, that the period of time

considered reasonable for the mental anguish would cease upon information that 'puts to rest the fear of injury.' " *Carroll.*

*See also Castro v. New York Life Insurance Co.,* 153 Misc.2d 1, 588 N.Y.S.2d 695, 697 (Sup.1991) (custodian may recover where stuck by a hypodermic needle discarded in the trash of an insurance company office, insofar as she had "a claim ... tied to a distinct event which would cause a reasonable person to develop a fear of contracting a disease like AIDS").

■ In the instant case, we cannot say that appellants' alleged fear of acquiring AIDS was initially unreasonable as a matter of law, even though the averments of the complaints did not identify any actual channel of transmission of the AIDS virus. But *Burk's* requirement that plaintiffs must allege actual transmission would unfairly punish them for lacking the requisite information to do so.

■ Appellants' *continued* fear of contracting AIDS may, however, be unreasonable after they tested HIV–negative upon learning of Dr. Almaraz's illness, which was well over a year after their last contacts with the physician. As we noted above, there is current credible evidence of a 95% certainty that one will test positive for the AIDS virus, if at all, within six months after exposure to it.[9] Once appellants learned of their HIV–negative status more than a year after their respective surgeries, the possibility of their contracting AIDS from Dr. Almaraz became extremely unlikely and thus, as a matter of law, might be deemed unreasonable. Therefore, appellants may only recover for their fear and its physical manifestations which may have

---

**9.** This figure may well be conservative. According to the Centers for Disease Control, "[a]lmost all people develop HIV antibodies within two to twelve weeks, but it can take up to six months after infection.... *To be sure* [that one does not have the virus, one must be tested] at least 6 months after ... last engag[ing] in behavior that can transmit HIV." U.S. Department of Health and Human Services, *Voluntary HIV Counseling and Testing: Facts, Issues, and Answers,* 1991 (emphasis added).

resulted from Almaraz's alleged negligence for the period constituting their reasonable window of anxiety—the period between which they learned of Almaraz's illness and received their HIV–negative results.[10]

In this regard, we note that it was formerly the rule that there could be no recovery of tort damages for mere fright or mental suffering caused by negligence unconnected with physical impact or injury. *P., B. & W.R. Co. v. Mitchell*, 107 Md. 600, 607, 69 A. 422 (1908). Our subsequent cases have departed from this rigid rule. In *Green v. Shoemaker*, 111 Md. 69, 77, 73 A. 688 (1909), we first acknowledged the rule that mere fright, without any physical injury resulting therefrom, cannot form the basis of a cause of action because "mere fright is easily simulated, and because there is no practical standard for measuring the suffering occasioned thereby, or of testing the truth of the claims of the person as to the results of the fright." *Id.* Nevertheless, we held in *Shoemaker* that when it is shown "that a *material physical injury* has resulted from fright caused by a wrongful act," there is no sound reason for denying a right of action "for such physical injury." *Id.* at 77, 73 A. 688. We recognized that nervous disturbances may constitute suffering of the body or of the mind since nerves and nerve centers of the body are part of the physical system which may be weakened from causes acting upon the mind. *Id.* at 78–79, 73 A. 688. This, we said, could be a physical injury. In so holding, we quoted with approval from *Sloane v. Southern Cal. R.R.*, 111 Cal. 668, 44 P. 320 (1896), another tort case in which there was no physical impact, that if the plaintiff's

" 'nerves, or the entire nervous system are thus affected, there is a physical injury thereby produced; and if the

---

**10.** We note that the window of anxiety closes once satisfactory information becomes available that puts to rest the fear of injury. Hence, even had the appellants not undergone immediate blood testing, their recovery span would be limited to the same duration, for the fear-relieving information, if known to them, would have been available for their retrieval.

primal cause of this injury is tortious, it is immaterial
whether it is direct, as by a blow, or indirect, through
some action upon the mind.' "

111 Md. at 79, 73 A. 688. We then said that

"where the wrongful act complained of is the proximate
cause of the injury ... and where the injury ought, in the
light of all the circumstances, to have been contemplated
as a natural and probable consequence thereof, the case
... should be left to the jury."

*Id.* at 81, 73 A. 688.

We next referred in *Shoemaker* to *Denver & R.G.R. Co.
v. Roller,* 100 F. 738 (9th Cir.1900), in which the jury was
instructed as follows:

" 'If great fright was a reasonable and natural conse-
quence of the circumstances in which the collision afore-
said, with the ensuing wreckage, explosion and conflagra-
tion, placed the plaintiff, and if she was actually put in
fright by those circumstances, and injury to her health
was a reasonable and natural consequence of such fright,
and was actually and proximately occasioned thereby,
then said injury is one for which damages are reason-
able.' "

*Id.* [111 Md.] at 82, 73 A. 688. We declared in *Shoemaker*
that "[t]he reasoning upon which that conclusion was
reached is, in our opinion, sound." *Id.*

Our later cases, expanding upon *Shoemaker,* have held
that there can be compensable injuries from fright or shock
without physical impact. *See, e.g., Mahnke v. Moore,* 197
Md. 61, 77 A.2d 923 (1951); *Bowman v. Williams,* 164 Md.
397, 165 A. 182 (1933); *Tea Co. v. Roch,* 160 Md. 189, 153 A.
22 (1931); *Balt. & Ohio R.R. Co. v. Harris,* 121 Md. 254, 88
A. 282 (1913).

In *Vance v. Vance,* 286 Md. 490, 408 A.2d 728 (1979), we
held that damages could be recovered for emotional distress
resulting from a tortious act; that a "physical injury" could
be proved by evidence indicative of a mental state; and that
the term "physical" in this context is not to be afforded its

usual dictionary meaning, but rather as an injury "capable of objective determination." *Id.* at 500, 408 A.2d 728. The injuries alleged in *Vance* were mental distress, nervousness, sleeplessness, spontaneous crying, and depression; there was no medical diagnosis of any physical ailments. In finding Mrs. Vance's injuries to be legally cognizable, we said that the requirement of "physical injury" for recovery in negligence meant only that the alleged injuries must be objectively measurable.

The evidence in *Vance* showed that Muriel and Arnold Vance were married in a religious ceremony, lived together for 18 years, and had two children. Then Arnold left Muriel for another woman. She sought a decree awarding her alimony and child support. Arnold opposed the action on the ground that at the time of his marriage to Muriel he had not been divorced from his first wife and, therefore, his marriage to Muriel was void. It appeared that Arnold originally believed that his decree of absolute divorce from his first wife was final, and had told Muriel that he was free to marry her. About one month after their marriage, Arnold discovered that his divorce decree had not become final until after his marriage to Muriel. Arnold never told Muriel that their marriage was a nullity. She did not discover it until Arnold sought to annul the marriage 20 years later.

The evidence at trial was that the disclosure that Muriel's twenty-year marriage was void had a devastating effect on her.

"She went into a state of shock, engaged in spontaneous crying and for a period seemed detached and unaware of her own presence. She was unable to function normally, unable to sleep and too embarrassed to socialize. In addition to experiencing symptoms of an ulcer, Muriel suffered an emotional collapse and depression which manifested itself in her external condition, *i.e.*, her significantly deteriorated physical appearance —unkempt hair, sunken cheeks and dark eyes."

*Id.* at 501, 408 A.2d 728. We held that this evidence was legally sufficient to establish symptoms of a mental state evidencing a "physical injury." *Id.*

> "The evidence showed that Muriel suffered an objectively manifested, definite nervous disorder of a magnitude similar to the mental distress established in *Green, Bowman,* and *Roch....* [T]he evidence was sufficient to support a jury finding that Muriel was physically injured as a foreseeable result of [Arnold's] negligent misrepresentation concerning his marital status."

*Id.* (footnote omitted).

In the instant case, appellants allege that their fear and mental and emotional distress are accompanied by headache, sleeplessness, and the physical and financial sting of blood tests for the AIDS virus. *Vance* and its precursors dictate that appellants may recover for these injuries, to the extent that they can objectively demonstrate their existence. Again, however, such damages must be confined to injuries suffered during the appellants' legitimate window of mental anxiety; after this point, for the reasons discussed above, any lingering injuries, as a matter of law, are no longer related to fear that is reasonable.

■ For all of the foregoing reasons, the trial court erred in dismissing appellants' negligence complaints against Dr. Almaraz, which were based on his asserted failure to disclose his infected condition. Appellants have alleged facts which, if proven, indicate that Dr. Almaraz may have breached a legal duty, thereby causing them to suffer legally compensable injuries. As we said in *Curley v. General Valet Service,* 270 Md. 248, 264, 311 A.2d 231 (1973), negligence is a relative term, to be decided upon the facts of each particular case, and, consequently, it is ordinarily a question of fact to be determined by the fact-finder. Where, as here, we must accept as true all well-pleaded factual allegations of the complaints, as well as all favorable factual inferences deducible therefrom, we cannot declare as a matter of law that Dr. Almaraz was not guilty of

negligence due to his claimed failure to communicate that he was HIV-positive. We, therefore, must find, as to these negligence counts, that appellants alleged sufficient facts in their complaints to survive the appellees' motions to dismiss.

## D

■■■■■■ We next consider whether the appellants have stated a cause of action in negligence against appellee Hopkins Hospital. Like any other employer, a hospital is responsible under agency principles for the negligence of its servants or employees; this vicarious liability extends to any apparent agents whom a hospital represents as its employees. *Mehlman v. Powell,* 281 Md. 269, 378 A.2d 1121 (1977); *Franklin v. Gupta,* 81 Md.App. 345, 567 A.2d 524 (1990). The existence of an agency relationship is a question of fact which must be submitted to the factfinder if any legally sufficient evidence tending to prove the agency is offered. *P. Flanigan & Sons, Inc. v. Childs,* 251 Md. 646, 652, 248 A.2d 473 (1968); *Hamilton v. Caplan,* 69 Md.App. 566, 575, 518 A.2d 1087 (1987).

Appellants here alleged that Hopkins represented that Dr. Almaraz was its agent; that they believed that he was its agent; and that they relied on this representation and Hopkins' excellent medical reputation in selecting Almaraz as their surgeon. Because it is undisputed that Almaraz enjoyed "operative privileges" at Hopkins, we cannot say as a matter of law that the facts alleged in the appellants' complaints are legally insufficient on their face to aver an agency relationship. Thus, the trial court erred in dismissing appellants' basic negligence complaints against Hopkins.

## V

In view of our disposition of the basic negligence counts grounded on Dr. Almaraz's asserted failure to warn the appellants of his infected condition, and because the dam-

ages claimed on all counts are essentially the same, the trial judge erred in dismissing the other counts as well. As we see it, after viewing the allegations of the complaints in support of these counts, dismissal was not appropriate in the circumstances.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY DISMISSING THE COMPLAINTS REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEES.