## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1998-IA-00939-SCT

*SOUTH CENTRAL REGIONAL MEDICAL CENTER*

*v.*

*JIMMIE N. PICKERING AND THOMAS W. PICKERING*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/09/1997 |
| TRIAL JUDGE: | HON. BILLY JOE LANDRUM |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | BROOKE FERRIS |
| | RICHARD O. BURSON |
| ATTORNEY FOR APPELLEES: | LEONARD B. MELVIN |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED -11/4/1999 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 11/29/99 |

## BEFORE PITTMAN, P.J., MILLS AND WALLER, JJ.

## MILLS, JUSTICE, FOR THE COURT:

### STATEMENT OF THE CASE

¶1. On September 22, 1989, Jimmie N. Pickering and her husband, Thomas W. Pickering, filed suit against South Central Regional Medical Center (South Central) in the Circuit Court of the Second Judicial District of Jones County seeking damages for negligent infliction of emotional distress. The lawsuit arose out of a September 30, 1987 incident in which Jimmie N. Pickering was possibly exposed to HIV and other communicable diseases when she used an allegedly contaminated lancet (used for pricking one's finger to draw blood) that was allegedly stored improperly by a nurse employed by South Central. South Central moved for summary judgment on the Pickerings' claims for emotional distress caused by her fear of contracting HIV or other communicable diseases. The circuit court denied South Central's motion but later amended its judgment granting certification for interlocutory appeal. Subsequently, on July 27, 1998, South Central filed its Petition for Interlocutory Appeal with this Court pursuant to M.R.A.P. 5, and by order of this Court South Central's Petition was granted.

### STATEMENT OF THE FACTS

¶2. Between September 30 and October 4, 1987, Jimmie N. Pickering was a patient at South Central. Pickering is a diabetic and was at South Central obtaining services related to this illness. Specifically, Pickering maintains that she was at South Central to regulate her increasingly volatile blood sugar levels and to receive instructions on how to regulate those levels in the future. In order to determine her blood sugar

levels at the hospital Pickering used the hospital's Autoclix machine. The Autoclix contained lancets that Pickering used to prick her finger to draw blood. Pickering contends that the lancets that were stored in the Autoclix that she was given to use by the hospital had actually been used before by some other unknown patient and/or patients. In other words, these lancets were used lancets.

¶3. Pickering claims that the nurse responsible for her treatment informed her directly that the lancets in question were, in fact, used lancets. As noted, part of Pickering's treatment at South Central was supposed to include instructions on how to test/regulate her blood sugar levels. Pickering asserts that after requesting her nurse several times to give her those instructions, the nurse finally agreed. The nurse then requested that Pickering simply show her the routine that she followed. The nurse then handed the "kit" to Pickering at which point Pickering picked up a lancet. The nurse immediately grabbed Pickering's hand apparently in an attempt to prevent Pickering from using the lancet. The nurse then informed her that the group of lancets from which Pickering had chosen was a group of previously used lancets. The nurse then immediately disposed of the lancets in the proper receptacle in the room. When Pickering asked the nurse why she had not disposed of the lancets before this incident, Pickering claims that the nurse responded that the receptacle was only implemented two weeks earlier and that she had not grown accustomed to using it. Furthermore, Pickering claims that every time she had previously tested her blood she pricked her finger with the used lancets.

¶4. Pickering admits that she has no other evidence that the lancets had been previously used other than the nurse's reaction and statement. However, it is undisputed that South Central ordered Pickering to be tested for HIV following the incident. Furthermore, Pickering asserts in her deposition that South Central tested eleven more patients all of whom had been attended by the same nurse and all of whom had used the same diabetic kit that Pickering had used.

¶5. Pickering offers no evidence that the lancets that she used were contaminated with HIV or any other communicable diseases. In fact, the lancets were disposed of by South Central before any tests could be run on them. Nevertheless, after it became clear that Pickering was possibly using used lancets South Central conducted an HIV test on Pickering. The first test was conducted while Pickering was still in the hospital in September of 1987. The results of this test were negative. Pickering was then tested for HIV and other communicable diseases by South Central at no charge four more times--November 1987, January 1988, March 1988, and September 1988--and once by another institution in August of 1990. All of these tests were negative.

¶6. In support of its motion for summary judgment, South Central provided the affidavit of Francis S. Morrison, M.D., a board certified hematologist and internist. Dr. Morrison's affidavit stated that, after reviewing Pickering's medical records, it was his opinion that Pickering would not develop HIV in the future. He also stated that the longest period of time between exposure by skin puncture and development of HIV positivity is ten (10) months.

¶7. After learning that she had been using these previously used lancets, Pickering claims that she became extremely anxious and afraid that she might have contracted HIV via the used lancets. Indeed, Pickering claims that she feels like "part of me is lost" because she no longer socializes with her friends, does not actively participate in her granddaughter's life, and does not go grocery shopping anymore for fear that she will infect those around her. Furthermore, Pickering claims that she is subjected to ridicule in the form of snickering and pointing by others whom she believes know about the incident in the hospital. Her claims of

emotional distress are supported by the deposition testimony of six other individuals-five family members and one friend.

## STANDARD OF REVIEW

¶8. The standard for reviewing the granting or the denying of summary judgment is the same standard as is employed by the trial court under Miss. R.Civ.P. 56(c). This Court conducts *de novo* review of orders granting or denying judgment and examines all the evidentiary matters before it-admissions in pleadings, answers to interrogatories, depositions, affidavits, etc. The evidence must be viewed in the light most favorable to the party against whom the motion has been made. If, in this view, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, summary judgment should be entered in his favor. Otherwise, the motion should be denied. Issues of fact sufficient to require denial of a motion for summary judgment obviously are present where one party swears to one version of the matter in issue and another says the opposite. In addition, the burden of demonstrating that no genuine issue of fact exists is on the moving party. That is, the non-movant would be given the benefit of the doubt. *McCullough v. Cook*, 679 So.2d 627, 630 (Miss. 1996); *Mantachie Natural Gas Dist. v. Mississippi Valley Gas Co.*, 594 So.2d 1170, 1172 (Miss. 1992); *Clark v. Moore Mem'l United Methodist Church*, 538 So.2d 760, 762 (Miss. 1989) *Short v. Columbus Rubber & Gasket Co.*, 535 So.2d 61 (Miss. 1988).

## ANALYSIS

¶9. South Central points to the relatively recent case of *Leaf River Forest Prods., Inc. v. Ferguson*, 662 So.2d 648 (Miss. 1995) in arguing that since Pickering has offered no evidence of actual exposure to HIV or any other disease she must therefore lose on her emotional distress claim. In *Ferguson*, this Court stated that "if one is to recover for emotional distress predicated on potential future illness there must be substantial proof of exposure and medical evidence that would indicate possible future illness." *Ferguson*, 662 So.2d at 658. The plaintiffs in *Ferguson* brought a claim for emotional distress based on a fear of developing cancer in the future. *Id.* at 651. They alleged that the Leaf River Mill was producing a toxic byproduct, dioxin, which was released into a nearby river on which the plaintiffs lived and exposing them to an increased risk of developing cancer. *Id.* The property of one of the plaintiffs was located one hundred miles down river from the mill, and another plaintiff's property was located approximately one hundred and twenty-five miles down river from the mill. *Id.* The Fergusons did not have themselves, their property or their well water tested for the presence of dioxin; instead they relied on tests of wildlife in the area of the Leaf River to support their claims of emotional distress. *Id.* at 651, 653. In finding the Fergusons' claims for emotional distress based on a fear of developing cancer in the future to be without merit, we stated:

> We have before found that emotional distress inflicted either negligently or intentionally is compensable. However, emotional distress based on the fear of a future illness must await a manifestation of that illness or be supported by substantial exposure to the danger, and be supported by medical or scientific evidence so that there is a rational basis for the emotional fear. We do not harm and, in fact, preserve a recovery for emotional distress when the same is based on such a foundation.

*Ferguson*, 662 So.2d at 650. This Court went on to hold specifically that there was a lack of evidence proving exposure of the Fergusons to a dangerous or harmful agent and that therefore their emotional distress claims should fail. *Id.* at 658.

¶10. As noted, we have established that an essential requirement in bringing a successful claim for emotional distress based on a fear of future illness is the offering of "substantial proof of exposure and medical evidence that would indicate possible future illness." *Ferguson*, 662 So.2d at 658. Although this Court has not decided a case based on the fear of contracting AIDS, it is logical that the standard in *Ferguson*, a fear of developing cancer case, would apply, for the similarity between the fear of contracting AIDS claims and so-called cancer phobia claims has led many courts to apply the rationale of cancer phobia cases to AIDS phobia claims. Wendy Allison Reese, *Tort Law Actual Exposure or Possible Exposure?: The AIDS Phobia Debate-Are Courts Opening the Litigation Floodgates or Illustrating Judicial Proscription?* 22 Am. J. Trial Advoc. 495 (1998). It is instructive to examine how other jurisdictions have treated fear of contracting AIDS cases.

¶11. A majority of the jurisdictions that have considered claims of infliction of emotional distress based on a fear of contracting AIDS have determined that actual exposure to HIV is a necessary requirement for the claim. See *Burk v. Sage Prods., Inc.*, 747 F. Supp. 285, 288 (E.D. Pa. 1990) (holding that absent any proof that the plaintiff was in fact exposed to HIV, the plaintiff cannot recover damages for his fear of contracting AIDS); *Brzoska v. Olson*, 668 A.2d 1355, 1363 (Del. 1995); *Russaw v. Martin*, 472 S.E.2d 508, 512 (Ga. Ct. App. 1996); *Neal v. Neal*, 873 P.2d 871, 876 (Idaho 1994); *Doe v. Northwestern Univ.*, 682 N.E.2d 145, 152 (Ill. App. Ct. 1997) (requiring a slightly different standard of actual exposure wherein a plaintiff who fears contracting AIDS because of a defendant's negligence can "recover damages for the time in which they reasonably feared a substantial, medically verifiable possibility of contracting AIDS"), *aff'd sub nom. Majca v. Beekil*, 701 N.E.2d 1084 (Ill. 1998); *K.A.C . v. Benson*, 527 N.W.2d 553, 559 (Minn. 1995); *De Milio v. Schrager*, 666 A.2d 627,629 (N.J. Super. Ct. Law Div. 1995) (holding that a plaintiff may not recover emotional distress damages in a fear of contracting AIDS claim unless the plaintiff shows both actual exposure and a scientifically acceptable mode of transmission; however, "where there exists proof that a defendant's wrongful conduct was either intentional or recklessly indifferent, a rebuttable presumption of exposure will arise, enabling [a] plaintiff to survive a motion for summary judgment"); *Bain v. Wells*, 936 S.W.2d 618, 620 (Tenn. 1997); *Babich v. Waukesha Mem'l Hosp., Inc.*, 556 N.W.2d 144, 147 (Wis. Ct. App. 1996) (requiring a plaintiff in a needle stick case to prove that the needle came from a contaminated source).

¶12. One of the most recent cases illustrative of this actual exposure approach is *Pendergist v. Pendergrass*, 961 S.W.2d 919 (Mo. Ct. App. 1998). In June of 1993, Pendergist, a hemophiliac, was diagnosed as having a hernia. *Pemdergist*, 961 S.W.2d at 921. Pendergist elected to have the hernia surgically repaired. *Id.* Because Pendergist was a hemophiliac it was necessary to administer to him Factor VIII, a clotting agent that prevents excessive bleeding. *Id.* Pendergist claimed that before his hernia surgery he specifically requested that he be given a "synthetic" form of Factor VIII called Recombinant Factor VIII as opposed to the human whole blood Factor VIII. *Id.* Pendergist claimed that he requested the Recombitant Factor VIII because it was safer than human whole blood Factor VIII and incapable of transmitting diseases. *Id.* Pendergist experienced a successful surgery but learned afterwards that he had received human whole blood Factor VIII. *Id.* Pendergist claimed that he began to feel "angry, frustrated and helpless." *Id.* He further maintained that he became "distrustful and paranoid" and began to grow concerned about contracting AIDS or hepatitis B. *Id.* at 922. Thereafter, Pendergist was tested four times over a period of three and one half years for HIV with each test yielding a negative result. *Id.*

¶13. Pendergist filed suit seeking damages for claims based on negligent infliction of emotional distress. *Id.*

The Missouri Court of Appeals held that "although Pendergist offered proof of a scientifically accepted method of transmission, the transfusion of a blood product, he failed to offer any evidence that the blood product was contaminated with HIV or hepatitis B . . . ." *Id.* at 926. In ruling against Pendergist, the court acknowledged several public policy reasons for adopting the actual exposure requirement in fear of AIDS cases:

> First, it ensures that a genuine basis for the fear exists and that the fear is not premised on public misconceptions about AIDS . . . . To hold otherwise would "open a Pandora's Box of 'AIDS-phobia' claims by individuals whose ignorance, unreasonable suspicion or general paranoia cause them apprehension over the slightest of contact with HIV-infected individuals or objects . . . .Second, an actual exposure rule preserves an objective component in emotional distress cases necessary to ensure stability, consistency, and predictability in the disposition of those cases . . . . Consistent results encourage early resolution and settlement of cases. Third, the rule ensures that victims who are exposed to HIV or actually contract HIV as a result of a defendant's negligence are compensated for their emotional distress . . . . A rule providing an unrestricted right of recovery for all persons fearing AIDS could exhaust resources of defendants and insurers. Similarly, such a rule could compromise the availability and affordability of medical, dental, and malpractice insurance, medical and dental care, prescription drugs, and blood products . . . . Finally, an actual exposure rule protects the justice system from becoming burdened with frivolous litigation . . . . "were we to rule otherwise, one could readily envision fear of AIDS claims being raised for every blood transfusion, accidental needle puncture, or matrimonial (or other) sexual infidelity.". . .

*Id.* (citations omitted).

¶14. The minority approach maintains that actual exposure is not a prerequisite to recovery under an infliction of emotional distress claim based on a fear of contracting HIV/AIDS. *See Marchia v. Long Island R.R.*, 31 F.3d 1197 (2d Cir. 1994); *Chizmar v. Mackie*, 896 P.2d 196, 206 (Alaska 1995); *Barret v. Danbury Hosp.*, 654 A.2d 748, 757 (Conn. 1995) (stating that the court would not adopt the actual exposure requirement, but requiring that the fear of distress alleged by the plaintiff be reasonable); *Dollar Inn, Inc. v. Slone*, 695 N.E.2d 185, 188-89 (Ind. Ct. App. 1998); *Bordelon v. St. Frances Cabrini Hosp.*, 640 So.2d 476, 478-79 (La. Ct. App. 1994); *Faya v. Almaraz*, 620 A.2d 327, 337-38 (Md. 1993) (allowing plaintiff to recover for emotional distress during "window of anxiety" period defined as the period between the time a plaintiff learns of possible exposure to HIV and the receipt of HIV negative results without a showing of actual exposure); *Hartwig v. Oregon Trail Eye Clinic*, 580 N.W.2d 86, 91-95 (Neb. 1998); *Tischler v. Dimenna*, 609 N.Y.S.2d 1002, 1009-10 (N.Y. Sup. Ct. 1994).

¶15. An example of the "window of anxiety" approach is *Madrid v. Lincoln County Med. Ctr.*, 923 P.2d 1154 (N.M. 1996). In September of 1992, Sonia Madrid was transporting medical samples from Lincoln County Medical Center to facilities in Albuquerque. *Madrid*, 923 P.2d at 1155. During the transport one of the sample containers leaked, and Madrid's hands were splashed with the bloody fluid. *Id.* Madrid claimed that at the time of the incident she had unhealed paper cuts on her hands. *Id.* She knew that it was possible to contract HIV by contact with blood or other bodily fluids through unhealed cuts. *Id.* Madrid was tested for HIV without knowing whether the culprit blood sample was HIV-positive or HIV-negative. *Id.* She tested negative. *Id.* Two months passed before Madrid learned that the patient with whose blood she had been splattered tested HIV-negative, and an additional two years passed before

Madrid learned that only the one "tested" container had leaked. *Id.* Madrid sued Lincoln County Medical Center for infliction of emotional distress arising from her fear that she might have contracted HIV as a result of being negligently exposed to bloody fluid of unknown origin. *Id.* The New Mexico Supreme Court held that summary judgment for the medical center was inappropriate. *Id.* at 1163. The court refused to adopt the majority actual exposure requirement and focused its decision primarily on the goal of deterring unreasonable conduct stating:

> In light of the deadly nature of the AIDS virus, reasonable care should be encouraged, for example, in the handling of potential disease-transmitting agents such as blood products. The potential for liability encourages those engaged in conduct that may result in an exposure incident to use reasonable care. Further, the imposition of liability for unreasonable conduct deters others from repeating such conduct. To the extent that such a system of incentives and disincentives serves to decrease the number of exposure incidents, recognition of a cause of action for negligent infliction of emotional distress serves the laudable goal of promoting public health.

*Id.* at 1162. The court did imply, however, that Madrid's recovery should be limited to the time period between the alleged exposure incident and the receipt of conclusive test results demonstrating that she is HIV-negative. *Id.*

¶16. In the case *sub judice*, South Central argues that the actual exposure requirement of ***Ferguson*** should apply to the Pickerings' claims, and since they have not offered any evidence of actual exposure to HIV or any other disease their claim for emotional distress for fear of contracting HIV and/or other communicable diseases should fail as a matter of law. South Central correctly notes that the allegedly used lancets were disposed of before they were tested for the presence of any disease causing agents. The Pickerings therefore are precluded from meeting the actual exposure requirement of ***Ferguson***. South Central fails to point out, however, that it is South Central that is responsible for the lancets being thrown away before they could be tested for the presence of HIV and/or other disease causing agents. According to deposition testimony, the nurse discarded the lancets despite the fact that a question about their sterility had been raised. The Pickerings had no opportunity, therefore, to prove that Jimmie was actually exposed to HIV.

¶17. Without abandoning the actual exposure requirement established in ***Ferguson***, we hold that in actual exposure cases, the plaintiff need only establish that the defendant owed a duty to the plaintiff to protect her from exposure to diseases, that the defendant breached that duty by negligently allowing or causing a medically recognized instrument or channel of transmission to come into physical contact with the plaintiff, that the resulting emotional injury was a foreseeable result of that breach, and that there was, in fact, an emotional injury in order to make her prima facie case. Consequently, where the defendant allowed or caused the best evidence to be destroyed, despite the fact that the defendant had notice that a material, factual issue existed regarding that evidence, thereby resulting in the plaintiff's being denied an opportunity to test it, a rebuttable presumption of actual exposure would arise in favor of the plaintiff. The defendant would then bear the burden of proving that the instrument with which the plaintiff came into contact as a result of the defendant's negligence did not contain or carry a disease causing agent. This prevents the unjust result of punishing a plaintiff for not being able to offer substantial proof of exposure where the source of that substantial proof has been destroyed by the defendant. Of course, where the defendant did not know or have reason to know that the evidence which it discarded was in question and where it was disposed of during the course of usual medical practice, a rebuttable presumption in favor of the plaintiff would not arise. The plaintiff would retain the burden of proving actual exposure. The extent of the defendant's knowledge is

a question of fact to determined by the fact finder. If the fact finder concludes that the defendant had no notice, then the rebuttable presumption would not arise. If the fact finder determines that the defendant had notice, then the rebuttable presumption would apply.

¶18. Several significant public policy concerns are promoted under this standard. First, it encourages hospitals and other health care providers to use reasonable care in handling instruments capable of transmitting disease. Second, it forces these parties to conduct tests to determine the presence of any disease causing agents on the instrument in the event that the instrument negligently comes into contact with an individual. The health care provider is most often the only party in a position to make this determination since it is he or she that possesses control over the instrument. Allowing the health care provider or owner of the instrument to discard or destroy that instrument without first making a determination of its ability to transmit diseases would undermine the important public concern of promoting good health. It would allow the potential tortfeasor to defeat easily a viable claim simply by preventing the plaintiff access to an essential element of his or her case. Furthermore, this immediate determination would quell any significant and, therefore, recoverable fears and anxieties that would emerge in the victim as a result of the encounter by providing him or her with the knowledge that the instrument was not contaminated. In the absence of any disease causing agents on or in the instrument or channel of transmission the burden of offering "substantial proof of exposure" would fall on the plaintiff.

¶19. Today we do not overrule our holding in *Ferguson*. We simply offer a way for the plaintiff to recover damages brought about by the defendant's negligence that would otherwise not be recoverable because of the defendant's subsequent act of blocking the plaintiff's path to a successful case by destroying or disposing of a key element in the plaintiff's case. In *Ferguson*, this rebuttable presumption procedure would have had absolutely no effect since the defendant in no way interfered with the instruments or channels of transmission. The Fergusons had access to these channels-their property and their well water. *Ferguson*, 662 So.2d at 651. However, they chose not to have those channels tested. *Id.* The Pickerings did not have a choice. South Central made the choice for them. South Central chose not to have the lancet tested for the presence of disease even though it was aware that a question regarding its sterility had been raised. South Central was in the best position to determine the capability of the lancet to transmit disease causing agents. A simple and relatively expeditious test of the lancet would most likely have prevented the Pickerings from developing any substantial or reasonable fears of contracting any communicable diseases. At any rate, it would have forced the Pickerings to prove actual exposure via another channel of transmission-a viable channel that was not destroyed or disposed of by South Central subsequent to the initial incident. The trial court's denial of summary judgment is affirmed.

¶20. In the absence of illness as a result of the alleged exposure, we further hold that Pickering's potential recovery is limited to the time between when Pickering learned of the possible exposure and the receipt of conclusive HIV negative results. Of course, this recovery period presupposes that the plaintiff has been properly tested for HIV such that conclusive results are in fact possible. Indeed, in the event that the plaintiff fails or refuses to obtain adequate and reliable testing for the presence of HIV/AIDS in his or her own body, the rule of *Ferguson* will prevail, and no such cause of action shall lie. In the case *sub judice*, the Pickerings did, in fact, obtain reliable testing, the results of which were all negative.

¶21. South Central offered the affidavit of a physician stating that the longest period of time between exposure by skin puncture and development of HIV positivity is ten (10) months. The Pickerings, of course, may offer their own evidence on this issue. Therefore, the Pickerings may only recover for the emotional

distress they experienced as a result of the alleged negligence of South Central for the period constituting this "window of anxiety."

## CONCLUSION

¶22. Finding no error in the ruling below, we affirm the trial court's denial of summary judgment, and we remand this case to the trial court for further proceedings consistent with this opinion.

¶23. **AFFIRMED.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, McRAE, SMITH, WALLER AND COBB, JJ., CONCUR.**