[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The instant proceeding sounds in medical malpractice. On June 13, 1990, Allen Barrett (hereinafter "Barrett") went to the Danbury Hospital complaining of abdominal pain. The defendant doctor (hereinafter "doctor") examined Barrett and ordered him to position himself on a gurney. During the course of that examination, the doctor became aware that Barrett was sitting in blood and in an effort to locate the source of the blood, he performed a rectal examination. The plaintiffs allege that in the course of this examination, blood was introduced into Barrett's rectum. The doctor diagnosed the complaint as a gallstone condition, and administered an injection to soothe the pain. He performed a second rectal examination. It is alleged that blood was introduced into Barrett's rectum. The doctor was unable to locate the source of the blood; however, Barrett examined the stretcher and recites that as he pressed the CT Page 2176 vinyl pad, blood oozed out.
The first count of the amended complaint is brought against the hospital. It pleads that the hospital was negligent in that it, through its agents, servants or employees, breached a duty by failing to inspect and maintain its equipment, by allowing the stretcher to be in a dangerous condition, and by failing to warn Barrett of the condition of the stretcher when the hospital knew, or through the exercise of reasonable care should have known, of the stretcher's condition. Barrett further claims that as a result, he has suffered and will continue to suffer from the anxiety and fear associated with his belief that he may contract the AIDS virus or another life threatening, blood transmitted disease. He continued by asserting that as a further result of the hospital's negligence, he is fearful of transmitting a life threatening disease to his wife thereby causing him great mental anguish and a deprivation of his wife's consortium.
The second count is also directed against the hospital, and alleges that since the stretcher and the stretcher's condition were under the sole management and control of the hospital, an action lies against the hospital under the doctrine of res ipsa loquitur. The third too targets the hospital. In it, the plaintiff Mary asserts that as a result of the hospital's negligence, she has been deprived of her husband's consortium, and is in grave fear of being infected with a life threatening, blood transmitted disease. The fourth count is brought by Barrett against the defendant doctor. He claims negligence in that the doctor breached a duty by (1) failing to inspect and clean the stretcher before or during the administration of treatment to Barrett; (2) unreasonably performing two rectal exams in an effort to search for the source of bleeding, whereby blood was introduced into Barrett's rectum when the doctor knew or should have known that Barrett had a history of gall bladder pain, a condition which would not produce the type of bleeding which the doctor suspected; (3) failed to supervise employees whose job it was to inspect, maintain and repair the stretcher, (4) allowed the stretcher to be in a defective condition; and (5) failing to warn Barrett of the condition of the stretcher when the doctor knew, or through the exercise of reasonable care should have known, of the stretcher's condition. In the fifth count Barrett recites that an action lies against the doctor pursuant to the doctrine of res ipsa loquitur. The sixth is CT Page 2177 framed against the doctor, reiterates the allegations of count three, i.e., loss of consortium. The defendants have filed a motion for summary judgment and each of the parties has duly filed the requisite documentation.
There have been few cases in any jurisdiction discussing this relatively recent cause of action known as "AIDS phobia." It seems appropriate, therefore, to discuss most of them as a preliminary overview.
A Federal District Court sitting in the Eastern District of Pennsylvania seems to have made the first significant contribution to the subject. A paramedic received a puncture wound from a needle protruding from a container designed for the disposal and containment of used medical syringes. He brought a product liability action against the manufacturer and distributor of the container alleging, inter alia, negligence. His claim arose from his fear of contracting AIDS as a result of the needle puncture. He was constrained to admit that: (1) he could not prove that he was injured by a needle that was used on an AIDS patient, and (2) he tested negatively on five separate occasions for the HIV virus. Despite these admissions, he asserted that since the incident occurred, he lived in fear of contracting AIDS and he and his spouse each sought recovery for the deterioration of their marriage.
The court observed that he had admitted that he was unable to demonstrate that the needle that pricked him was used on an AIDS patient and, therefore, he could not show that he had been exposed to the AIDS virus. His position is in marked contrast to the other situations where recovery for fear of contracting a disease has been held compensable. Those cases which have allowed recovery for fear of disease have done so when the plaintiffs were faced only with the question of whether they would contract the disease in the future. The plaintiff faced the additional question of whether he had been exposed to the AIDS virus in the first instance.
In deciding whether to grant the defendant's motion for summary judgment, the court noted that the plaintiff admitted that he had received five blood tests since the incident, and that the result of each of the blood tests had been negative for HIV antibodies. The last of these tests took place on CT Page 2178 February 5, 1990, more than one year after plaintiff was allegedly pricked by the needle. He could then be confident a high degree of medical certainty that he would not contract AIDS as a result of the needle puncture injury. The court was reluctant to allow someone to recover for fear of contracting a disease after it has become substantially likely that he will not develop the illness.
In actually granting the defendant's motion for summary judgment, the court focused upon the facts that the plaintiff here had alleged no injury which arose out of his exposure to the AIDS virus. His only injuries stemmed from his fear that he had been exposed to the disease. Since he could not prove the requisite exposure, and because it appeared to be a medical fact that he would not develop AIDS as a result of the needle-stick incident, the motion for summary judgment was granted. Burk v. Sage Products, Inc. 747 F. Sup. 285.
State courts have appeared to concur in the holding in Burk and denied recovery. In New York, a doctor performed surgical procedures on a patient whom he later learned had tested positive for the HIV virus. He alleged that because he was unaware of the patient's condition, he did not take the necessary precautions with regard to extra equipment which would have been at his disposal (e.g., full face shield, goggles, etc.). Consequently, he believed he had contracted the AIDS virus, and that because of the long gestation period associated with that virus (sometimes five years or more), he suffered from "HIV phobia." His claim fell victim to a motion for summary judgment in which the court held that it was uncontroverted at the present time that the plaintiff tested negative for HIV and had not suffered a loss of income as a result of his "exposure." Absent any allegation of an unusual occurrence (e.g., no broken glove, pierced skin, or patient bite) during the surgical procedure or indicia of infection in the physician's postoperative health, the claim asserted was insufficient as a matter of law. Ordway v. County of Suffolk, 583 N.Y.S.2d 1014-1017.
In Idaho, one Mary Neal, the then wife of the plaintiff Thomas, asserted a counterclaim in an action for divorce alleging, inter alia, emotional distress suffered as a result of her fear of contracting sexually transmitted diseases because of her husband's alleged extramarital affair with a counter-defendant, Jill LaGasse. The court framed the issue CT Page 2179 as ". . . Mary concedes, she is unable to demonstrate that she was actually exposed to these diseases. She has not alleged that any of the parties involved was infected with any of these diseases. Thus, our inquiry in this case is whether . . . Mary's fear of developing a disease constitutes a legally compensable injury . . . . Our concern in this case is . . . whether her fear meets the reasonableness standard absent a showing that she was actually exposed to a disease."
In affirming the District Court's dismissal of Mary's claim for emotional distress, the court reasoned that in order to be actionable, a plaintiff's fear of a disease must be based on more than the mere possibility of exposure to a disease or disease-causing agent. To hold otherwise would invite claims and allow recovery for the fear of AIDS where the plaintiff had undergone a blood transfusion, for the fear of developing tuberculosis based on evidence that a person had coughed in the plaintiff's face, or for fear of cancer where the plaintiff had inhaled or ingested an unknown substance, all without any proof that a disease-causing agent was present. The theoretical basis for Mary's exposure to the disease she feared was even more attenuated. It was rounded on the factually unsupported and not alleged premise that Jill LaGasse might have carried the disease, which then may have been transmitted through her sexual intercourse with Thomas, who then may have transmitted the disease to Mary. It declined to extend the law to recognize emotional injuries on such a remote and tenuous basis where, to reiterate, there is no showing that LaGasse actually was infected with or suffered from any sexually transmitted disease. Neal v. Neal, 1993 WL 22394 (Idaho App., June 29, 1993) *5, 6, 7.
Certain it is that there are other decisions which recognize the fear of AIDS as a compensable injury, but require that a plaintiff establish actual exposure to the disease before allowing recovery. See Hare v. State,570 N.Y.S.2d 125 (2d Dept. 1991) wherein an X-ray technician, while attempting to help a corrections officer subdue an inmate only rumored to have possibly had AIDS, was denied recovery on his claim of fear of contracting the disease because there was no proof that the inmate was infected. The technician was tested several times with negative results. See Doe v. Doe, 136 Misc.2d 1015, 519 N.Y.S.2d 595 (Supreme Court 1987) contained a factual scenerio wherein a wife was denied recovery where she alleged "AIDS-phobia" resulting from CT Page 2180 her husband's failure to disclose that he had a homosexual relationship. She, most significantly, had failed to allege either that she or her husband had actually contracted the disease. See Johnson v. West Virginia University Hospitals,413 S.E.2d 889 (W.Va. 1991) in which there was no dispute that the AIDS infected blood of a patient came in contact with the blood of a security officer as a result of the officer being bitten by the patient. Recovery was limited to the situation where a plaintiff is actually exposed to AIDS as a result of physical injury and recovery allowed for emotional distress, along with the attendant physical manifestations resulting therefrom.
There are, of course, other decisions which are not within the context of a medical malpractice claim, where courts have permitted recovery for the fear of contracting AIDS in the absence of proof of actual exposure. In each of these cases, a plaintiff sustained injuries from an accidental puncture from a discarded hypodermic needle.
Carroll v. Sisters of St. Francis Health Services, Inc., 1992 WL 276717 (Tenn.App. ) presented a factual predicate for the Tennessee Court of Appeals to reverse the trial court's order granting partial summary judgment to the defendant.[1]
The plaintiff, while visiting her sister in the hospital, reached her hand into the top of a container which appeared to be a towel dispenser. Three of the plaintiff's fingers were accidently pricked by sharp objects within the container. Upon informing the nurse on duty of her unfortunate incident, the plaintiff learned that the paper towel holder was really a contaminated needle receptacle. She immediately became fearful of contracting AIDS, and alleged that she was entitled to money damages from the defendant hospital because of her "great anxiety, fear, and emotional distress" resulting from her belief that she would contract the disease and die. The court in Carroll relied upon a previous Tennessee Supreme Court case, Laxton v. Orkin Exterminating Co., 639 S.W.2d 431
(Tenn. 1982), where recovery was allowed against an exterminating company which had leaked chemicals into the plaintiff's drinking supply, absent evidence of physical illness. Carroll had expressed very clearly that the court did not construe Laxton to require the strict rules of actual exposure imposed by the courts in Pennsylvania and West Virginia (Burk v. Sage Products, Inc., Johnson v. West Virginia University Hospitals, Inc., and Funeral Services by CT Page 2181 Gregory, Inc. v. Bluefield Community Hospital, 413 S.E.2d 79
(W.Va. 1991).)
It did, however, construe Laxton to set a standard of "reasonableness" of the fear. In reversing a summary judgment against the plaintiff, the court recited that the plaintiff's body was invaded by contaminated needles. The record contained proof that the medical profession presumes AIDS virus contamination from used needles, such as there involved. Summary judgment was granted because the plaintiff could not prove that the needle or needles which stuck her fingers were actually contaminated with the AIDS virus, although, as in Laxton, she was exposed to a possible dangerous contaminant. Under those facts, there was a disputed issue of material fact as to whether or not the plaintiff's fear of contracting AIDS was reasonable. As in Laxton, the period of the plaintiff's mental anguish was confined from the period of time from the needle prick until other factors made the fear unreasonable.
The question was whether fear of contracting AIDS was a valid cause of action under the Federal Employers' Liability Act (FELA) seems to be one of first impression in the Eastern District of New York in 1993. The plaintiff was stuck by a hypodermic needle while cleaning out a railroad shaftway. The court concluded that the FELA does encompass a cause of action for fear of contracting the AIDS virus where the basis of the claim is a documented physical injury sustained by the plaintiff. In speaking to the validity of the alleged emotional injuries predicated upon fear of contracting AIDS, the court recited that whether or not a plaintiff's psychological "injury" after the incident constituted compensable damage in addition to the physical harm was a material question of fact for the jury. In that type of case, the finder of fact may conclude that the plaintiff has sustained sufficient physical injury to support an award for mental anguish, even if subsequent medical diagnosis fails to reveal any other physical injury, and even though there is no proof at this time that the plaintiff has in fact contracted AIDS. Summary judgment in these circumstances was clearly inappropriate. Marchica v. Long Island Railroad, 810 F. Sup. 445,449-453 (E.D.N.Y. 1993).
The age old problem of legitimate versus false claims was addressed in a rather perfunctory manner in Castro v. New York Life Insurance Co., 153 Misc.2d 1, 588 N.Y.S.2d 695, 697
CT Page 2182 (Sup. 1991) wherein a cleaning worker's claim of "AIDS-phobia" was (1) proven to have its origin on the date on which she was allegedly punctured by a hypodermic needle, and (2) a "massive informational campaign" designed to educate the public on AIDS existed, were facts which if established would give the plaintiff's claims the requisite guarantee of genuineness.
"AIDS-phobia," as it has been framed within the context of a medical malpractice action, occurred in a factual pattern where a defendant surgeon knew himself to be HIV positive. Two patients long after surgery was performed learned of their surgeon's illness from a local newspaper. Subsequent to testing negative for the AIDS virus, both filed suit against the then deceased surgeon's estate claiming, inter alia, intentional infliction of emotional distress. The lower court dismissed both complaints concluding that even if the appellants had been potentially exposed to the virus, their HIV negative status more than six months after surgery made it extremely unlikely that they would ever develop AIDS. In reversing the dismissal of the complaints, the court was constrained to comment that it could not be said that the appellants' alleged fear of acquiring AIDS was initially unreasonable as a matter of law, even though the averments of the complaint did not identify any actual channel of transmission of the AIDS virus. The requirement that plaintiffs must allege actual transmission would unfairly punish them for lacking the requisite information to do so. The appellants' continued fear of contracting AIDS could, however, be unreasonable after testing HIV-negative upon learning of the physician's illness, which was well over a year after their last contacts with him. There was current credible evidence of a 95 percent certainty that one will test positive for the AIDS virus, if at all, within six months after exposure to it.
Once the appellants learned of their HIV-negative status more than a year after their respective surgeries, the possibility of their contracting AIDS from the surgeon became extremely unlikely and thus, as a matter of law, might well be deemed unreasonable. Therefore, recovery may be had only for their fear and its physical manifestations which may have resulted from the physician's alleged negligence for the period constituting their reasonable window of anxiety, the period between which they learned of Almaraz's illness and received their HIV-negative results. Faya v. Almaraz, CT Page 2183620 A.2d 327, 329-337 (Md. 1993). See also Kerins v. Hartley, 62 U.S.L.W. 2087 (Calif. Ct. App. 1993), citing Faya v. Almaraz, supra (whether or not a plaintiff can prove actual blood-to-blood blood exposure at the hands of a known to be infected surgeon, the fear of developing AIDs becomes unreasonable as a matter of law only after the plaintiff has had an opportunity to determine with reasonable medical certainty that exposure and/or infection with the AIDS virus has not occurred).
Before concluding, it is appropriate to mention that the similarities between terminal cancer and AIDS, their latent manifestation and their deadly, incurable nature, have led courts and commentators to analyze actions for fear of contracting AIDS under the same standards as actions for fear of developing cancer. In fact, in the reported cases permitting a plaintiff to recover for fear of cancer from exposure to carcinogens, the fact of exposure has always been established. In addition, plaintiffs also have been permitted to recover for their fear of developing tuberculosis where they were exposed to active tuberculosis with the result that their bodies were infected by dormant tubercle bacillus. Neal v. Neal, supra, citing Plummer v. United States, 580 F.2d 72
(3d Cir. 1978).
With the foregoing decisions and the several rationales expressed by the courts therein in mind, the issue at hand will be addressed. A motion for summary judgment shall be granted "`if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Connell v. Colwell, 214 Conn. 242,246, quoting Zichichi v. Middlesex Memorial Hospital,204 Conn. 399, 402. A material fact is simply a fact which will make a difference in the result of the case. Genco v. Connecticut Light Power Co., 7 Conn. App. 164, 167. The burden of proof is on the moving party. The facts presented must be viewed in the light most favorable to the party opposing the motion. State v. Goggin, 208 Conn. 606, 616. "To satisfy his burden, the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact." Fogarty v. Rashaw, 193 Conn. 442, 445, quoting Dougherty v. Graham, 161 Conn. 248, 250. Issue finding, rather than issue determination, is the key to the procedure. Yanow v. Teal Industries, Inc., 178 Conn. 262, 269. The issue CT Page 2184 to which the court must speak in the present case is whether the fear in and of itself of contracting and/or transmitting acquired immune deficiency syndrome (AIDS) constitutes a compensable injury in a cause of action sounding in negligence or medical malpractice.
HIV is a necessary prerequisite to developing AIDS. It can only survive in the habitat of bodily fluids, and the only fluids capable of transmitting the virus are blood, semen, vaginal fluids, and breast milk. To contract the virus, a fluid of the carrier must enter the body of another. Generally, transmission of HIV is accomplished through either: (1) unprotected sexual intercourse; (2) the sharing by intravenous drug users of contaminated syringes; or (3) receiving a blood transfusion. Faya v. Almaraz, 620 A.2d 327,331-32.
Interestingly enough, the court in Faya, took judicial notice of one other fact regarding HIV and that is that while there is often a long latency period between infection with HIV and the onset of AIDS, at least ninety-five (95) percent of HIV carriers will test positive for the virus (though not manifest AIDS) within six months of acquiring it. See Morbidity and Mortality Weekly Report, July 21, 1989, Vol. 38, No. S-7. At least one other court has also judicially noticed this fact. See Burk v. Sage Products, Inc., 747 F. Sup. 285,288 (E.D.Pa. 1990). ("It is a medically accepted fact . . . . that a person who has been infected will still test positive for the HIV antibody during this latency period when no symptoms are evident, assuming the accuracy of the HIV test. It is extremely unlikely that a patient who tests HIV-negative more than six months after a potential exposure will contract the disease as a result of that exposure.") AIDS is the disease that results when opportunistic infection preys on a bodily immune system that has been weakened by HIV. AIDS is the acute clinical phase of immune dysfunction. Infected patients are thus prone to acquiring disease and infection that a person with an otherwise healthy immune system would be able to combat. Faya v. Almaraz, supra, 329-31.
The defendants argue in support of their motion that this court should adopt a rule which mandates that any plaintiff whose claims arise solely from a prolonged fear of contracting AIDS should be required to prove actual exposure to the virus by a disease causing agent and that the fear of contracting CT Page 2185 AIDS is reasonable. They continue by asserting that the allegations in the complaint do not support the conclusion that their fears of contracting the AIDS virus are indeed reasonable. They conclude by reciting that the plaintiffs have neither submitted evidence nor alleged that (1) the blood located on the gurney created exposure to blood containing the AIDS virus, or (2) that Barrett himself was exposed to the AIDS virus.
Several affidavits and a letter from the plaintiffs' counsel are appended to the defendants' motion. The first is that of Sara Tomaino, a registered nurse who was employed in the emergency room of the hospital on the date of the alleged incident. She swears that not only was she the registered nurse involved in the care and the treatment of Barrett on June 13, 1990, but that "[t]he spot of blood on the sheet on the stretcher was about the size of a half-dollar and a somewhat more oblong shape of approximately of one to two inches at its greatest measurement. There was only spot [sic] of bright red blood . . . . Only the patient's underwear and the sheet beneath his buttocks were found to be streaked with bright red secretions."
The second was offered over the signature and oath of the defendant doctor who attended to Barrett who states that:
 I performed the rectal examination which yielded stool but did not appear bloody. The stool was tested for occult blood and the test was negative. To double check the results, the rectal examination was repeated to confirm that there was no blood emanating from the patient's rectum. Each time the results were negative . . . The fact that the report was negative for any blood in the stool is also indicative of successful examination without the transmission of any blood from the stretcher to the patient's rectum . . . It is my opinion, with a reasonable degree of medical probability, that MR. BARRETT had insufficient contact with the blood on the stretcher to transmit any disease whatsoever.
A third affidavit submitted is that of Mary Ellen Ginnetti, the Risk Manager of the defendant hospital. Ms. Ginnetti avers that she "was requested by the attorneys CT Page 2186 representing the Hospital to inspect all emergency room records for treatment rendered between midnight June 12, 1990 and 5:00 a.m. on June 13, 1990. None of these cases detailed a medical history of either AIDS, infection with the HIV virus, or AIDS-related syndrome."
The fourth and last affidavit is that of Dr. Frank Bia, a board certified physician of internal medicine with a sub-specialty in infectious diseases, and who is an associate professor and attending physician of the Yale AIDS care program. He has reviewed the emergency room records regarding Barrett, as well as the plaintiffs' amended complaint and the affidavits submitted in support of the defendants' motion. Bia states that:
 contact of blood with a patient's undergarments or hospital gown is insufficient to transmit the HIV virus to a patient . . . . Further, the patient has not tested positive for HIV to the present, some two years and six months, after the June 13, 1990 emergency room visit.
 With a great degree of medical probability, the patient would have sero-converted, that is, tested positive for HIV-I antibodies within six months of the alleged `exposure' if there had been any viral transmission as a result of this emergency room contact with blood on a stretcher . . . The chances of MR. BARRETT contracting HIV or AIDS from such an incident as described can be assessed as nil.
The plaintiffs, attempting to rebut the defendants' argument, contend that the motion should be denied because there are genuine issues of material fact regarding: (1) the applicable standard of care and whether the defendants breached that standard of care, (2) the status of prior patient(s) whose blood was on the stretcher, and (3) Barrett's contact with blood on the stretcher.
They, in turn, draw upon an affidavit of Ann Dion, an emergency room nurse of eighteen years. Ms. Dion, the Nursing Director of Ambulatory Services at Lawrence and Memorial Hospital, states that she has reviewed the copies of the emergency room records from the defendant hospital of June 13, CT Page 2187 1990, and that "[t]he Affidavit of Mary Ellen Ginnetti. . . . states that Ms. Ginnetti inspected `. . . all emergency room records for treatment rendered between midnight June 12, 1990 and 5:00 a.m. on June 13, 1990.' In my professional opinion, the blood on the stretcher at issue could have been there prior to midnight June 12, 1990." They would bootstrap their argument by noting that courts in other jurisdictions do not unanimously require proof of actual exposure to the AIDS virus and cite one case, Carroll v. Sisters of St. Francis Health Services, Inc., 1992 WL 276717 (Tenn.App. ),[2] for the proposition that a plaintiff can recover for emotional distress caused by a fear of contracting AIDS without proof that such plaintiff was exposed to the AIDS virus.
To paraphrase, they continue by claiming, arguendo, that even if the court were to require actual exposure, the allegations in the plaintiffs' amended complaint describes a "significant exposure" as defined in Sec. 19a-581 (14) of the General Statutes and Sec. 19a-589-1(o) Department of Health Services Regulation (D.H.S. Reg.) Section 19a-581 (14) reads:
 `Significant exposure' means a parenteral exposure such as a needlestick or cut, or mucous membrane exposure such as a splash to the eye or mouth, to blood or a cutaneous exposure involving large amounts of blood or prolonged contact with blood, especially when the exposed skin is chapped, abraded or afflicted with dermatitis. The department may further define significant exposure in regulations adopted pursuant to section 19a-589 . . . .
Regulation, Sec. 19a-589-1(o) provides, inter alia, that:
 `Significant exposure,' means an exposure as defined in Section 19a-581 (14) of the general statutes and: (1) contact between the mucous membranes (e.g. mouth or eyes) and at least one of the following: blood, a body fluid containing visible amounts of blood, cerebrospinal fluid, synovial fluid, pleural fluid, peritoneal fluid, pericardial fluid, amniotic fluid; (2) contact through the skin (such as contact through an open wound or cut or by means of a needlestick or puncture wound injury) with at least one of the CT Page 2188 following: blood, a body fluid containing visible amounts of blood . . . . (3) contact of skin, especially when the exposed skin is chapped, abraded or afflicted with dermatitis or the contact is prolonged or involving an extensive area, with at least one of the following: blood, a body fluid containing visible amounts of blood . . . .
Barrett postulates thereunder that the blood came into contact with his rectum and his affidavit recites that:
 When I saw the blood and realized that it had covered my backside and that Dr. Estaba had performed two rectal examinations and introduced the blood into my rectum, I became shocked and distraught and fearful that I might contract the AIDS virus, hepatitis or other blood product transmitted life threatening disease and that I might infect my wife, Mary Barrett.
They contend that since the content of Barrett's affidavit is in sharp contrast to the testimony provided by Sara Tomaino who stated that "[o]nly the patient's underwear and the sheet beneath his buttocks were found to be streaked with bright red secretions," that there is a genuine issue of material fact regarding the extent of Barrett's exposure to the blood on the stretcher.
They conclude that in Connecticut a plaintiff may recover solely for emotional distress, and cite Montinieri v. Southern New England Telephone Co., 175 Conn. 337, 345 for this proposition. Specifically, the plaintiffs argue that the court should apply the Montinieri standard, whereby a plaintiff could recover for unintentional infliction of emotional distress in cases where the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm to them, legally and logically, by having Barrett sit on a stretcher which was allegedly oozing with the blood of some other unknown person or persons, and by introducing that blood into his rectum during two rectal examinations, the defendants were alerted to foreseeable harm.
The defendants respond in a supplemental memorandum in CT Page 2189 support of their motion for summary judgment. They would overcome the plaintiffs' arguments by saying that Barrett's assertion that the doctor introduced blood during the performance of the rectal examinations is belied by the fact that microscopic examinations for the presence of blood as a result of both rectal exams came back negative. In addition, the defendants argue that by submitting the affidavit of Ann Dion, R.N., the plaintiffs have, in effect, sought to elevate her status from that of nurse to hematologist. To them, Ann Dion's statement amounts to nothing more than an "unsupportable opinion" that the blood on the gurney could have existed more than twenty-six (26) hours, in a liquid form, on the stretcher prior to the incident. It is significant to note, as observed by the defendants, that absent from the plaintiffs' memorandum or Ann Dion's affidavit "is any foundation that Ann Dion is any more qualified to render an opinion about the coagulation time of blood than any other individual who has no medical training."[3]
In order to be admissible for summary judgment purposes, affidavits must affirmatively show personal knowledge of the matters stated therein. Evans Products Co. v. Clinton Building Supply, Inc., 174 Conn. 512, 515; United Oil Co. v. Urban Redevelopment Commission, 158 Conn. 364, 377; Practice Book, Sec. 381. That standard precludes consideration of this court of the affidavits of both Bia and Ann Dion, as both affidavits declare expert opinions, as opposed to facts based upon personal knowledge. However, the court is under no such limitation in considering the letter from the plaintiffs' attorney, dated January 27, 1992, setting forth that Barrett "has gone for AIDS testing at the expense of the hospital [and] [t]o date has not tested positive for HIV." The inclusion of the letter, and the averments stated therein, were not objected to at oral argument, or in the plaintiffs' opposition memorandum.
 Counts One and Four, and Derivative Consortium Claims, Counts Three and Six.
To prevail on a medical malpractice claim, a plaintiff must establish four elements: "(1) the defendant must have a duty to conform to a particular standard of conduct for the plaintiff's protection; (2) the defendant must have failed to measure up to that standard; (3) the plaintiff must suffer actual injury; and (4) the defendant's conduct must be the CT Page 2190 cause of the plaintiff's injury." LaBieniec v. Baker,11 Conn. App. 199, 202-03.
In a medical malpractice action of no little interest, the plaintiff sought to recover for an injury to the plaintiff's intestine which occurred during surgery. The injury necessitated repair by means of a bowel resection. The doctor who attended to the plaintiff's injury testified for the plaintiff that "the plaintiff faces an increased risk of future bowel obstruction but that he thought the risk was remote." The plaintiff testified that she was advised of this increased risk of future bowel obstruction. Her expert testified that based on literature he had consulted, she had an 8 to 16 percent chance of developing the future bowel obstruction.
On appeal, the named defendant physician claimed, inter alia, that the trial court erred "in allowing the jury to award the plaintiff compensation for her fear of a future bowel obstruction, since the evidence established that there was only a possibility that the plaintiff would develop a bowel obstruction and this possibility was too speculative to support the inclusion in the verdict of damages for such a fear." Petriello v. Kalman, 215 Conn. 377, 381, 391.
As to this claim, the court stated that the jury had the results of research indicating that "there was between an 8 and 16 percent chance that the plaintiff would suffer a future bowel obstruction . . . therefore . . . the court correctly instructed the jury that it might award the plaintiff damages for her fear of the increased risk that she will someday suffer from a bowel obstruction." Petriello v. Kalman, supra, 391-92.
The defendant also argued that the trial court "incorrectly instructed the jury that the plaintiff should be compensated for whatever risk there was of some future injury." In response, the court stated:
 Her claim . . . was for compensation for the increased risk that she would suffer such an obstruction sometime in the future. If this increased risk was more likely than not the result of the bowel resection necessitated by the defendant's actions, we conclude that there is no CT Page 2191 legitimate reason why she should not receive present compensation based upon the likelihood of the risk becoming a reality. When viewed in this manner, the plaintiff was attempting merely to establish the extent of her present injuries . . . The medical evidence in this case concerning the probability of such a future consequence provided a sufficient basis for estimating that likelihood and compensating the plaintiff for it.
Petriello v. Kalman, supra, 395-396.
Once again, the damage claimed to have been caused by the negligence of the defendants is a fear of contracting AIDS. No injury which has arisen out of Barrett's alleged exposure to blood with the potential of exposure to the AIDS virus. There certainly is no assertion that he, or any other party, was infected with, or actually exposed to, blood that was tainted with a transmittable disease. In direct contrast to Petriello, the plaintiffs here in have not provided any medical evidence establishing the extent of their present injuries, nor have they provided evidence concerning the probability or likelihood of contracting the AIDS virus in the future. The record is devoid of any evidence to support the likelihood that the risk Barrett perceives, no matter how slight, may become a reality. In fact, he has tested negatively for HIV for more than one year after the incident.
The court reiterates that Barrett and his wife cite and rely on one case, Carroll v. Sisters of St. Francis Health Services, Inc., supra.[4] That reliance is after the fact inapposite. Carroll turned on the fact that the record in that case contained evidence that the plaintiff had pricked her hand on a used needle and proof that the medical profession presumes AIDS virus contamination from used needles. Under the facts of Carroll, the disputed issue of fact was whether the plaintiff's fear of contracting AIDS was reasonable in light of the presumption of AIDS virus contamination from used needles. In this proceeding, there is no allegation that Barrett was stuck by a needle, or, for that matter, ever exposed to the AIDS virus. Carroll is hardly persuasive without considering that it is no longer the law.
The progression of Barrett's argument contends that even if this court were to require actual exposure, the allegations CT Page 2192 in the plaintiffs' amended complaint describe a "significant exposure" to Barrett pursuant to Sec. 19a-581 (14) of the General Statutes and Reg. Sec. 19a-589-1(o) of the Department of Health Services. An examination of the legislative history of Chapter 368, AIDS Testing and Medical Information, Sec.19a-581 ("SB 812") et seq., indicates that there are six major purposes for SB 812.
 One is to insure that individuals being tested for HIV virus give consent before testing. Secondly, it's to insure that consent for testing is truly informed consent . . . . Further, it is to insure that results of tests and other AIDS related information is certainly kept confidential. Also, it's to provide a procedure for testing a person if at work has been accidentally exposed to his or her blood. It's also to allow the Department of Health Services and under certain conditions, circumstances, physicians to warn sex and needle sharing partners of people infected with the virus. And lastly, to provide for specific exceptions to inform [sic] consent and confidentiality when the public health or the health of another person is involved. Under each of these exceptions, the need for disclosure and the need for privacy are carefully balanced.
(Comments of Representative Dezinno (84th), House Debate, Calendar 605, 1989 Sess., p. 10725.)
Dezinno's comments are particularly cogent when compared with the actual language contained in Sec. 19a-582, and the subsections contained therein. For instance, Sec. 19a-582 (a) provides, in part:
"[N]o person shall order the performance of an HIV related test without first receiving written informed consent or oral informed consent . . . ."
Subsection (e) of 19a-582 provides, in part:
 The provisions of this section shall not apply to the performance of an HIV-related test: (5) [i]n cases where a health care provider or other person in the course of his occupational duties has had a CT Page 2193 significant exposure . . . (7) [i]n facilities operated by the department of correction if . . . the behavior of the inmate poses a significant risk of transmission to another inmate or has resulted in a significant exposure of another inmate . . . (Emphasis added.)
Upon examination of both the legislative history and the plain language of the statute, the court concludes that the term "significant exposure" is employed only in determining when an HIV-related test can be ordered without first receiving written or oral informed consent within the context of a regulatory or policy making statute. This legislation is not instructive in determining whether a fear of contracting AIDS constitutes a compensable injury.
While Barrett stated in his affidavit that blood had been introduced into his rectum, he and his wife have offered no evidence to support this conclusory statement. An affidavit in opposition to a motion for summary judgment should not be "conspicuously devoid of evidentiary matter," but should recite facts pursuant to Sec. 381 of the Practice Book "which contradict those offered by the moving party." Citizens National Bank v. Hubney, 182 Conn. 310, 312. In the present case the evidence contains the defendant doctor's statements regarding the "non"-introduction of blood into the plaintiff's rectum and the fact that the report was negative for any blood in the stool. The documentary evidence offered in this case includes Tomanio's affidavit which has been previously commented on. Simply stated, the blood spot on the sheet of the stretcher was about the size of a half-dollar, and that only the plaintiff's undergarments were found to be streaked with blood. Barrett in his attempt to controvert this by declaring that he noticed a "large bloody area" on his "johnny coat," has provided no evidence that contact with blood on a patient's undergarments or hospital gown is sufficient to transmit the HIV virus to a patient.
Barrett is unable to demonstrate an exposure to a disease-causing agent, and has not refuted nor contested the defendants' assertion that he has tested negatively for HIV for more than one year after the incident. Barrett's fear is unreasonable in view of the facts and evidence presented to this court. Mere anxiety about a completely fictitious or imagined consequence, having no reasonable basis, is not a CT Page 2194 recoverable element. (Citation omitted.) LaBieniec v. Baker, supra, 207. The motion for summary judgment must be and is granted as to counts one and four.
Counts one and four also include a claim for the deprivation of "the companionship, services, security and emotional support, love, felicity, solace, affection and consortium of the Plaintiff, Mary Barrett . . . ." A consortium action is derivative of the injured spouse's cause of action. A consortium claim would be barred when the suit brought by the injured spouse has been terminated by an adverse judgment on the merits. Hopson v. St. Mary's Hospital, 176 Conn. 485, 494.
Mary Barrett's claim, to reiterate, is derivative and inextricably attached to the claim of her spouse. The basis of Barrett's claim is factually unsupported and, therefore, the corresponding loss of consortium claims brought by her in counts three and six should fail, and that failure is also applicable in counts one and four to where Barrett has alleged a loss of consortium claim in his own right. "A claim for loss of consortium does not stand alone. It is not a cause of action in and of itself." Emanuele v. Boccaccio Susanin, Superior Court, Judicial District of Hartford/New Britain at Hartford, No. 379367 (April 10, 1992, Miano, J.).
II. Res Ipsa Loquitur
In counts two and five of their amended complaint, the plaintiffs state that "the Plaintiff, Allen Barrett, does not propose to be bound by his specific allegations of negligence . . . . [as set forth in count one], but the Plaintiff . . . relies upon general allegations as to the cause of the blood oozing from the stretcher and its introduction onto and into the Plaintiff on the theory of res ipsa loquitur." The doctrine of res ipsa loquitur permits a jury to infer negligence when no direct evidence has been introduced. The doctrine has no evidential force, does not shift the burden of proof and does not give rise to a presumption. The necessary elements to be pleaded so that a case can be submitted to a jury on the theory of res ipsa loquitur are:
 (1) The situation, condition, or apparatus causing the injury must be such that in the ordinary course of events no injury would result unless from a CT Page 2195 careless construction, inspection or user. (2) Both inspection and user must have been at the time of the injury in the control of the party charged with neglect. (3) The injurious occurrence or condition must have happened irrespective of any voluntary action at the time by the party injured.
Malvicini v. Stratfield Motor Hotel, Inc., 206 Conn. 439, 443, quoting Schurgast v. Schumann, 156 Conn. 471, 479,242 A.2d 695 (1968). "Whether the doctrine applies in a given case is a question of law for the court." Malvicini v. Stratfield Motor Hotel, Inc., supra, 443.
In Estate of Just v. Aparo, 8 CSCR 542 (April 27, 1993, Higgins, J.), the plaintiff alleged in the first count a cause of action sounding in negligence, and in the third count a cause of action based on res ipsa loquitur. The court held that a plaintiff cannot reallege a negligence cause of action in a later count by merely claiming it as a separate cause of action based on the subject doctrine.
In the present action, the plaintiffs have alleged causes of action in negligence as to the hospital and doctor, respectively. The added second and fifth counts alleging causes of action based on res ipsa loquitur in that the damage caused to plaintiffs was a direct and proximate result of the hospital and/or doctor in failing to inspect the equipment and allowing the gurney to be in a defective condition. As in Estate of Just v. Aparo, supra, these plaintiffs cannot allege the same action again in counts two and five, merely claiming it as a separate action based on the doctrine of res ipsa loquitur.
Finally, the injury claimed by in count five is the fear of contracting AIDS in the future. As discussed above, the plaintiffs have submitted no facts to show that this fear is reasonable. They simply have not met their burden of establishing a claim for compensable injuries. The motion for summary judgment is granted as to counts two and five.
This court is constrained to hold that the defendants have met their burden of showing that there is no genuine issue of material fact in issue with regard to any of plaintiffs' claims of medical malpractice. Consequently, the motion for summary judgment is granted as to all counts of the CT Page 2196 plaintiffs' amended complaint.
Moraghan, J.